RUTAN & TUCKER, LLP
Milford W. Dahl, Jr. (State Bar No. 36796)
mdahl@rutan.com
611 Anton Boulevard, Fourteenth Floor
Costa Mesa, California 92626-1931
Telephone:   714-641-5100
Facsimile:   714-546-9035

Attorneys for Defendants and Cross-Complainants
Jack Dahl, an individual, by Jeanette Johnson, as his
successor in interest, and Jeanette Johnson, in her
individual capacity

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EXECUTIVE SECURITY MANAGEMENT, INC., a California corporation, d/b/a The APEX Group and CONTEMPORARY SERVICES CORPORATION, a California corporation, <br><br> Plaintiffs, <br><br> vs. <br><br> JACK DAHL, an individual, and JEANETTE JOHNSON, in her individual capacity and as successor in interest to Jack Dahl, POPULOUS HOLDINGS, INC., a Delaware corporation, formerly known as HOK Sport Venue Event, HOK Group, Inc., a Delaware corporation, <br><br> Defendants. <br><br> AND RELATED CROSS-ACTION. | Case No. CV-09-9273-CAS-RCx <br><br> **CROSS-COMPLAINANT'S POINTS AND AUTHORITIES IN OPPOSITION TO CROSS-DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> **[Filed concurrently with the Objections to Testimony of Bridget Ott; Reply to Amended Statement of Uncontroverted Facts and Proposed Conclusions of Law and Statement of Genuine Disputes; and Declarations of Jeanette Johnson and Milford W. Dahl, Jr. filed in support thereof]** <br><br> DATE:     October 24, 2011 <br> TIME:     10:00 a.m. <br> CTRM:     5 <br><br> Date Action Filed:  December 17, 2009 |

/ / /
/ / /
/ / /
/ / /

Rutan & Tucker, LLP
attorneys at law

034/026716-0001
2309505.1 a09/19/11

Cross-Complainant's Ps&As in Opposition to
Cross-Defendants' Motion For Partial Summary
Judgment

1. **THE COURT MUST DENY THE MOTION AS TO THE SECOND CAUSE OF ACTION FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ON JEANETTE JOHNSON**

   A. **The Basic Allegations Of The Second Cause Of Action Were Never Stricken By The State Court**

   Cross-Defendants' first argument is that Jeanette Johnson is precluded by the doctrine of "law of the case" from proceeding with this cause of action and producing evidence of the many intentional acts engaged in by Cross-Defendants which inflicted emotional distress upon her. As correctly stated, a motion to strike was filed by Cross-Defendants while this case was pending in the state court action and superior court Judge Jerry Fields granted the motion striking certain specific allegations of misconduct "as unnecessary." The cause of action was not stricken. Relevant allegations that were not stricken include:  Paragraph 1, p, 1, lines 12-17:

   > Over the course of their employment Dahl and Johnson were the recipients of calculated, intentional, malicious, and abusive misconduct engaged in by APEX, CSC and their majority owner and chief executive officer, Damon Zumwalt, the cross-defendants named herein and others, all for the purpose of enriching the cross-defendants and covering up cross-defendants' unfair and unlawful acts and inflicting substantial monetary and emotional damage on cross-complainants.

   Paragraph 14, p. 3, lines 1-5:

   > . . . each of the cross-defendants conspired together to engage in the conduct alleged herein and that each cross-defendant was acting within the scope of such agency, employment, representation, and conspiracy with the knowledge, consent and subsequent ratification, both express and implied, of each of the remaining cross-defendants.

   Paragraph 22, p. 6, lines 7-15:

   > On approximately January 27, 2008, Zumwalt and Oatess Archey attempted to enter the credentialing office at the Super Bowl in Phoenix, Arizona, even though they had not been properly credentialed. The NFL officials prohibited Zumwalt and Archey from entering the offices until they could be accompanied by NFL officials. Zumwalt became enraged and threatened to fire Dahl and another APEX employee and made loud comments for all to hear that he was

"going to shut the fucking place down." Zumwalt and Archey angrily exited the premises and made charges against Johnson and Dahl and initiated purported investigations against Dahl and Johnson and filed and served the Complaint in this action

Paragraph 23, p. 6, lines 16-28:

Before and on January 27, 2008, while cross-complainants were providing credentialing services to the NFL for the Super Bowl on behalf of cross-defendants, and after cross-defendants, and each of them, made numerous misrepresentations to the NFL employees and other persons concerning cross-complainants, making such defamatory accusations and statements that cross-complainants had stolen money, stole a company computer, stole company files, stole confidential and proprietary information, were incompetent, were planning on starting their own business, and were working for competitors rather than the best interest of APEX and CSC. Cross-complainants are informed and believe and on such information and belief alleged that cross-defendants made numerous other untrue accusations and statements to third parties, all of which will be the subject of discovery and trial. Cross-defendants made these statements with the express intent of damaging cross-complainants and inflicting substantial financial and emotional distress upon them.

Paragraph 32, p. 11, lines 6-7:

Within one year prior to the filing of the Complaint herein, cross-defendants, and each of them, engaged in the acts alleged above as well as the following acts:

Paragraph 32, p. 11, lines 8-13:

a.    When the NFL refused Zumwalt and Archey access to the security office at the Super Bowl, Zumwalt and Archey in addition to making loud threatening comments in the presence of NFL officials and others, as alleged in paragraph 23, determined to falsify allegations against Dahl and his wife Johnson and purported to initiate investigations against Dahl and Johnson and using said purported investigation undertook to defame, threaten and harm Dahl and Johnson.

The court also did not strike paragraphs 33, p. 16, lines 17-25:

Cross-defendants, and each of them, engaging in said actions abused their positions of authority and relationship in order to effect Johnson's interest knowing that Johnson was particularly vulnerable to emotional distress due to her cancerous condition and the life threatening cancerous condition of her husband Dahl. Cross-defendants, and each of them, undertook said actions knowing that their conduct would likely result in harm to Johnson due to mental distress,

Rutan & Tucker, LLP
attorneys at law

034/026716-0001
2309505.1 a09/19/11

Cross-Complainant's Ps&As in Opposition to Cross-Defendants' Motion For Partial Summary Judgment

1    or cross-defendants, and each of them, acted in reckless
     disregard of causing said emotional distress, knowing that
2    emotional distress would probably result from said cross-
     defendants' conduct and/or cross-defendants, and each of
3    them, gave little or no thought to the probable effect of their
     conduct.
4

5    Nor did the court strike paragraph 34, p. 16, line 26, through p. 17, line 3:

6         As a direct and proximate result of said conduct by
          cross-defendants, and each of them, cross-complainant
7         Johnson sustained mental distress including suffering,
          anguish, fright, horror, nervousness, anxiety, worry, shock,
8         humiliation and shame so substantial or long-lasting that no
          reasonable person in a civilized society should be expected to
9         bear it, all to cross-complainant Johnson's general damages in
          excess of $100,000.
10

11       Thus, the fact that certain specific allegations were stricken as being "unnecessary"

12   does not mean that Cross-Complainant is prohibited from offering evidence on those and

13   other allegations, none of which were asked about in Cross-Complainant's deposition taken

14   by Cross-Defendants.  Under noticed pleading Cross-Defendants have been well advised as

15   to the charges being made.

16   **B.    Johnson Is Not Precluded Under the Law Of The Case Doctrine From**

17         **Re-Litigating The State Court's Determination That Certain Allegations**

18         **Do Not State An Actionable Claim For Intentional Infliction of**

19         **Emotional Distress**

20       There are multiple reasons by law of the case does not apply as an absolute bar to

21   the Second Cause of Action.  First, under federal law the application of law of the case is

22   discretionary.  *U.S. v. Lummi India*, 235 F.3d 443, 452 (9th Cir. 2000).  Second, and more

23   importantly, under California law this was not a final ruling and law of the case would not

24   apply as law of the case only applies when there is a decision by an appellate court.

25   *Provience v. Valley Clerk's Trust Fund*, 163 Cal. App. 3d 249, 256, 209 Cal. Rptr. 276

26   (1984).  In fact, in *Provience* the court specifically held that law of the case was not

27   applicable to a ruling of a federal district court, which was later removed and remanded to

28   the state court.

Rutan & Tucker, LLP
attorneys at law

034/026716-0001
2309505.1 a09/19/11                                   -3-

Cross-Complainant's Ps&As in Opposition to
Cross-Defendants' Motion For Partial Summary
Judgment

1    Furthermore, under state court law, the trial court before there is an appellate

2  decision has the inherent power "to act either sua sponte or in response to a party's motion

3  to reconsider or revoke a prior order. *Wozniak v. Lucutz,* 102 Cal. App. 4th 1031, 1042

4  (2002); *Scott Co. of California v. United States Fid. and Guar. Ins. Co.,* 107 Cal. App. 4th

5  197, 210 (2003). In fact, in *Wozniak,* the court held that it was proper for one judge to

6  actually overrule a summary judgment made by a prior judge in the same case. Therefore,

7  it will be up to this court to determine what evidence it will hear.

8      **C.    The Trial Court Judge Was In Error In The First Place In Striking The**

9            **Specific Allegations As "Unnecessary"**

10    Although the judge gave some insight as to what he was thinking in granting the

11  motion to strike, it is not clear whether "unnecessary" was because these were specific

12  pleadings of fact rather than ultimate conclusions, or whether he was ruling as it appears

13  that each act in and of itself was not a sufficient act under this cause of action. Such an

14  analysis, however, was an improper one and Cross-Complainant feels confident the trial

15  judge would not have ruled accordingly, and, likewise, this court should exercise its

16  discretion in rejecting the law of the case, even if it is considered applicable under federal

17  law.

18    The problem with Cross-Defendants' motion is that Cross-Defendant generally

19  argued that each allegation separately in and of itself fails to reach the standard of

20  outrageous conduct that would cause extreme emotional distress and thus must be stricken.

21  The effect is to remove all factual allegations supporting the causes of action. Admittedly,

22  some, although not all, of the individual allegations standing alone in the context of a

23  normal person with no special relationships or medical conditions may not meet that test as

24  a matter of law. While a single act may be sufficient, a single act is not required to support

25  a cause of action. It is the totality of the acts in the factual circumstances that is the

26  ultimate test. This principle is stated in numerous cases. In *Rulon-Miller v. International*

27  *Business Machines, Corp.,* 162 Cal. App. 3d 241, 208 Cal.Rptr. 524 (1984), on appeal the

28  defendant challenged the trial court judgment for compensatory and punitive damages

Rutan & Tucker, LLP
attorneys at law

034/026716-0001
2309505.1 a09/19/11                          -4-

Cross-Complainant's Ps&As in Opposition to
Cross-Defendants' Motion For Partial Summary
Judgment

1  following a jury trial in favor of plaintiffs on several causes of action including intentional

2  infliction of emotional distress.

3      The Court of Appeal upheld the jury verdict and judgment.  In discussing

4  specifically the intentional infliction of emotional distress cause of action, the Court started

5  going through some of the acts of the defendant and stated:

6          The question is reduced to the inquiry of whether
           Calahan's status and conduct would be found by the jury to
7          fall within doctrinal requirements.
               . . .

8          So far the conduct is certainly unfair but not atrocious.  What
9          brings Calahan's conduct to an actionable level is the way he
           brought the several elements together in the second meeting
10         with respondent. . . .

11         The combination of statements and conduct would
           under any reason view tend to humiliate and degrade
12         respondent.  To be denied a right granted to all other
           employees for conduct unrelated to her work was to degrade
13         her as a person. . . .  The sum of such evidence clearly
           supports the jury finding of extreme and outrageous conduct.
14
15         "Accordingly, we conclude that the emotional distress cause
           of action was amply proved and supports the award of
           punitive damages."  (At 254-255; emphasis added.)
16

17  Another of many examples is *McDaniel v. Gile,* 230 Cal. App. 3d 363, 281 Cal. Rptr. 242

18  (1991), where an attorney brought an action against a client for unpaid legal fees and the

19  client cross-complained on several causes of action, including intentional infliction of

20  emotion distress.  The trial court ruled as a matter of law, as Cross-Defendants request this

21  Court to do, that the actions by the attorney did not constitute outrageous conduct.  The

22  Court of Appeal reversed and remanded with direction to set aside the Order Granting

23  Summary Adjudication holding that triable issues of fact remain as to whether the

24  attorney's conduct (not a single act) constituted outrageous conduct in light of the

25  relationship existing between the attorney and the client.  The appellate decision is

26  instructive in this case where we have former employees and individuals with severe life

27  threatening medical conditions:

28  / / /

Rutan & Tucker, LLP
*attorneys at law*

034/026716-0001
2309505.1 a09/19/11

-5-

Cross-Complainant's Ps&As in Opposition to
Cross-Defendants' Motion For Partial Summary
Judgment

1          To recover for intentional infliction of emotional
distress a plaintiff must show: "(1) outrageous conduct by the
2   defendant, (2) intention to cause or reckless disregard of the
probability of causing emotional distress, (3) severe
3   emotional suffering and (4) actual and proximate causation of
the emotional distress." (*Agarwal v. Johnson* (1979) 25
4   Cal.3d 932, 946 [160 Cal.Rptr. 141, 603 P.2d 58].) (3)
Outrageous conduct is that which exceeds "'. . . all bounds
5   usually tolerated by a decent society, [and is] of a nature
which is especially calculated to cause, and does cause,
6   mental distress. [Citation.] Ordinarily mere insulting
language, without more, does not constitute outrageous
7   conduct . . .   Behavior may be considered outrageous if a
defendant (1) <u>abuses a relation or position which gives him</u>
8   <u>power to damage the plaintiff's interest; (2) knows the</u>
<u>plaintiff is susceptible to injuries</u> through mental distress; or
9   (3) acts intentionally or unreasonably with the recognition
that the <u>acts are likely to result in illness through mental</u>
10  <u>distress." (*Ibid.*)

11         Moreover, "'[t]he extreme and outrageous character of
the conduct may arise from an abuse by the actor of a
12  position, or a relation with the other, which gives him actual
or apparent authority over the other, or power to affect his
13  interests. . . . . [¶]  The extreme and outrageous character of
the conduct may arise from the actor's knowledge that the
14  other is peculiarly susceptible to emotional distress, by reason
of some physical or mental condition or peculiarity.  The
15  conduct may become heartless, flagrant, and outrageous when
the actor proceeds in the face of such knowledge, where it
16  would not be so if he did not know.'" (*Newby v. Alto Riviera
Apartments* (1976) 60 Cal.App.3d 288, 297, fn. 2 [131
17  Cal.Rptr. 547], disapproved on other grounds in *Marina
Point, Ltd. v. Wolfson* (1982) 30 Cal.3d 721 [180 Cal.Rptr.
18  496, 640 P.2d 115, 30 A.L.R.4th 1161].)  (At pp. 372-373;
emphasis added.)

19

20      The court, in discussing plaintiff's claim that the individual acts were insufficient as

21  a matter of law to constitute outrageous conduct, stated first that the defendant had a special

22  relationship with plaintiff.  Secondly, plaintiff was in a position of actual or apparent power

23  over the defendant, and the defendant was particularly susceptible to emotional distress

24  because of her pending marital dissolution.  The court found with those facts coupled with

25  the multiple acts were sufficient to support and allow a jury to hear whether or not

26  plaintiff's conduct amounted to intentional infliction of emotional distress.

27      Likewise, in *Newby v. Alto Riveria Apartments,* 60 Cal. App. 3d 288, 131 Cal. Rptr.

28  547 (1976) at the close of plaintiff's evidence the defendants moved for a judgment of non-

Rutan & Tucker, LLP
attorneys at law

034/026716-0001
2309505.1 a09/19/11                                    -6-

Cross-Complainant's Ps&As in Opposition to
Cross-Defendants' Motion For Partial Summary
Judgment

1  suit on the jury causes of action including intentional infliction of emotional distress and

2  the court granted the motion.  The Court of Appeal reversed the judgment as to the cause of

3  action for emotional distress and affirmed all other respects holding that the plaintiff

4  present its substantial evidence that the <u>evidence of multiple actions</u> by defendants was

5  sufficient for the issue to go to the jury stating at page 298 "The total course of conduct

6  exhibited by respondents meets the test of outrageous conduct in *Alcorn* and *Golden*."  The

7  court went on to state:

8          (See also *Richardson v. Pridmore, supra*, at p. 130 (landlord
           changed lock and removed plaintiff's belongings while absent
9          from premises).)  In our situation, insulting language was part
           of a course of harassing, humiliating, and intimidating
10         conduct.  As the court in *Alcorn v. Anbro Engineering, Inc.*,
           noted: "Although it may be that mere insulting language,
11         without more, ordinarily would not constitute extreme
           outrage, the aggravated circumstances alleged by plaintiff
12         seem sufficient to uphold his complaint . . . ."  (2 Cal.3d at p.
           499.)  Further, respondents' conduct was not privileged.  "It is
13         well established that one who, in exercising the privilege of
           asserting his own economic interests, acts in an outrageous
14         manner may be held liable for intentional infliction of
           emotional distress.  [Citations.]"  (*Fletcher v. Western*
15         *National Life Ins. Co., supra*, 10 Cal.App.3d at pp. 395-396.)

16  (*Newby v. Alto Riviera Apartments, supra*, 60 Cal. App. 3d at 298.)

17         In our situation, insulting language, among other conduct, was part of a course of

18  harassing, humiliating and intimidating conduct.  As the court in *Alcorn v. Anbro*

19  *Engineering, Inc.*, noted: "Although it may be that mere insulting language, without more,

20  ordinarily would not constitute extreme outrage, the <u>aggravated circumstances alleged by</u>

21  <u>plaintiff seem sufficient to uphold his complaint</u> . . . ."  (2 Cal. 3d at p. 499.)

22         In the instant case what the allegations of the Cross-Complaint allege, and which

23  Plaintiff/Cross-Defendant is not denying, is that the Cross-Defendants engaged in a <u>specific</u>

24  <u>course of action against Cross-Complainant who were former employees,</u> one of whom was

25  a partial owner of APEX, and each of whom suffer life-threatening diseases, to destroy

26  their reputation and break them financially.  Plaintiff knew they were husband and wife and

27  it certainly would be a question of fact for a jury to determine whether inflicting distress on

28  one spouse also would inflict stress on the other spouse who is aware of and observed such

**Rutan & Tucker, LLP**
*attorneys at law*

034/026716-0001
2309505.1 a09/19/11

-7-

Cross-Complainant's Ps&As in Opposition to
Cross-Defendants' Motion For Partial Summary
Judgment

1   conduct.  In fact, it is absurd to believe that when a husband and wife are working closely

2   together and one observes misconduct on the other the one observing the misconduct could

3   not be severely emotionally distressed.  In *Delia S. v. Torres,* 134 Cal. App. 3d 471, 184

4   Cal. Rptr. 787 (1982), the appellate court affirmed a trial court judgment on a jury verdict

5   awarding a plaintiff husband damages for intentional infliction of emotional distress against

6   a defendant who had raped his wife.  (One must consider that withholding needed earned

7   money and forcing a spouse to work under the conditions alleged in the Cross-Complaint

8   may in and of itself be "rape" of the wife or husband.)  The court discussed a length why

9   the husband was entitled to such recovery and that discussion is apropos here:

10                     We find no merit in the averment that the trial court
          erroneously permitted George S. to recover for the intentional
11          infliction of emotional distress on a theory of consensual
          sexual intercourse or for a wrong against another.  The jury
12          was instructed that the intentional infliction of emotional
          distress requires "extreme and outrageous unprivileged
13          conduct of another done either with the specific intent to
          cause emotional distress or with a reckless disregard of the
14          probability of causing such distress" (BAJI No. 12.70) and
          that plaintiffs bore the burden of proving Billy Torres
15          intentionally inflicted emotional distress on George S.

16                                    . . .

17                     Defendant argues further that George S. was erroneously
          permitted to recover for a wrong against another in that he
18          neither was a direct victim of the act nor suffered shock as a
          result of sensory and contemporous observance of the act.
19          (*Molien v. Kaiser Foundation Hospitals* (1980) 27 Cal.3d
          916, 923 [167 Cal.Rptr. 831, 616 P.2d 813]; *Dillon v. Legg*
20          (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29
          A.L.R.3d 1316].)  Neither *Molien* nor *Dillon* is applicable to
21          the instant proceeding; each involves the negligent infliction
          of emotional distress.  In contrast, what is at issue here is the
22          *intent* to inflict such distress—an intent, either specific or
          implied from conduct evincing a reckless disregard for the
23          consequences, directed against George S.

24                     This state has recognized a cause of action for the
          intentional infliction of emotional distress where an
25          unauthorized autopsy was performed in the plaintiff's
          deceased husband.  In *Huntly v. Zurich Gen. A & L. Ins. Co.*
26          (1929) 100 Cal.App. 201 [280 P. 163], the court noted that
          "plaintiff's cause of action arose solely from her relationship
27          to deceased and the effect the mutilation [of the body] had
          upon her, personally."  (*Id.* At p. 212; see also Rest.2d Torts,
28          § 868, com. (a); cf. *Sinai Temple v. Kaplan* (1976) 54
          Cal.App.3d 1103, 112 [127 Cal.Rptr. 80].)  One may

Rutan & Tucker, LLP
*attorneys at law*

034/026716-0001
2309505.1 a09/19/11

-8-

Cross-Complainant's Ps&As in Opposition to
Cross-Defendants' Motion For Partial Summary
Judgment

1
2
3
4

> reasonably infer that the violation and rape of one's wife, particularly by a friend, would have similarly profound and extreme emotional consequences. Thus, the wrong for which recovery was sought was personal to George S. As in *Huntly*, it is his relationship to the object of the act and the effect of the transgression on him personally which gives rise to the cause of action. (*Id.* at 483-484.)

5  Making comments to third parties, including Dahl and Johnson's current employer

6  HOK Sport, claiming that Dahl and Johnson where thieves having stolen confidential

7  property and threatening to sue their employer could not have been sent for any other

8  purpose than to inflict distress on Dahl and Johnson by being concerned that their new jobs

9  might be in jeopardy.

10  Despite the contention that making statements to third parties cannot be actionable,

11  when, as here, they are made to friends, acquaintances, employers, and fellow employees of

12  the Cross-Complainants and made with the knowledge of Cross-Complainants, for the

13  purpose of damaging them, the making of such statements can be actionable. In *Guillory v.*

14  *Godfrey,* 134 Cal. App. 2d 628 (1955), the court specifically held that damages may be

15  awarded for mental suffering caused by intentional and outrageous conduct consisting of

16  inflammatory and defamatory statements made to third parties, in that case customers who

17  were about to do business with the Plaintiff. (See p. 630.) Not unlike here, the court found

18  that such statements were calculated to intimidate Plaintiff's customers and drive them

19  away from Plaintiff. These statements were made to the new employer and other persons

20  who had business relationships with the Cross-Complainants clearly intended to drive those

21  persons and entities away from Cross-Complainants and isolate the Cross-Complainants so

22  as to prohibit them from making a living. The *Guillory* court further stated at 632:

23
24
25

> "It is said that 'wrongful or malicious interference with the formation of a contract or the right to pursue a lawful business calling, trade or occupation has been generally held to constitute a tort. . . .'"

26  *Guillory* further went on to state what is a well established principle of law in

27  response to the Defendant's argument that since Plaintiff was already nervous and afflicted

28  with gallbladder trouble, the actions were not the proximate cause of any damage stating:

1  "It (referring to Defendant's argument) overlooks the principle that a tortfeasor must take

2  his victim as he finds him.  And when his wrong aggravates an existing disability he is

3  liable for that exacerbation and the task of measuring it in dollars is that of a trial, judge or

4  jury."  Here we have two vulnerable Cross-Complainants suffering from life threatening

5  cancer.

6       Plaintiff and Cross-Defendant APEX further argued that failing to pay the Cross-

7  Complainants what was rightfully due and owing to them, in violation of their employment

8  agreements and the Labor Code likewise cannot be sufficient actions to give rise to a cause

9  of action for intentional infliction of emotional distress.  Again, case law does not favor

10  their position.  In *Fletcher v. Western Nat. Ins. Co.,* 10 Cal. App. 3d 376, 89 Cal. Rptr. 78

11  (1970), the plaintiff husband and father received substantial compensatory and punitive

12  damages for intentional infliction of emotional distress when the insurance company failed

13  to pay monies that were due and owing to him coupled with making serious allegations

14  against his character (the same as was done here).  The appellate court in upholding the

15  verdict and judgment stated at 398:

16           As a result of defendant's communications he was
             worried and anxious about losing him home and his family
17           lacking food and clothing.  Plaintiff's worry and anxiety were
             inferably substantial in quantity, especially in view of
18           disabled and impecunious condition which was fully known
             to defendants when they acted.  Susceptibility of the plaintiff
19           to emotional distress and a defendant's awareness thereof,
             have often been mentioned as significant in determining
20           liability.

21       This is the precise situation that we have here with Cross-Defendants intentionally

22  cutting off income to which Cross-Complainants were entitled, even filing tax returns with

23  the IRS falsely claiming that Dahl had received income thus subjecting him to taxation or

24  prosecution by the IRS, threatening Dahl and Johnson's new employer and others in the

25  industry in which they worked, claiming they had stolen money and intellectual property,

26  all the while knowing of their severe, life threatening cancer.

27       Like the case cited above, each and all of these allegations to the extent they are

28  proven at trial are for the jury to consider whether the totality of the same constitutes

Rutan & Tucker, LLP
attorneys at law

034/026716-0001
2309505.1 a09/19/11

-10-

Cross-Complainant's Ps&As in Opposition to
Cross-Defendants' Motion For Partial Summary
Judgment

1    outrageous conduct entitling Cross-Complainants to compensatory damages and punitive

2    damages.

3    **D.    Johnson's Claim For Emotional Distress Damages Is Recoverable.**

4         Reliance on Johnson's therapist ambiguous testimony as to what she treated Johnson

5    for is of little assistance on this motion.  Ignoring the fact that Jeanette sought the assistance

6    of Ellen Bradley-Windell nine months after Jeanette's termination to help her cope with the

7    death of her husband Jack Dahl and ignoring Ms. Windell's testimony that her job was <u>not</u>

8    to go into the specifics of causes but to help Jeanette deal with the stress she was obviously

9    experiencing, Cross-Defendants present bits and pieces from the declaration of the therapist

10   Ms. Bradley-Windell's and her deposition to prove as a matter of law their actions did not

11   cause Cross-Complainant severe emotional distress.

12        Cross-Defendants' reliance on its interpretation of the testimony of Ellen Bradley

13   Windell is misplaced for several reasons.  First, Jeanette was not even referred to her until

14   November 2008, whereas the acts causing emotional distress occurred long before that date.

15   As stated by Ms. Windell in her letter of November 10, 2010 (Exhibit 2 to Ms. Rothauges'

16   declaration):

17            Jeanette was referred to me for counseling by her doctor's
             office after experiencing severe anxiety and panic attacks
18            related to her-then terminally ill husband Jack.  However, it
             became apparent that her anxiety and depression was
19            exasperated by a pending lawsuit that was going full force
             against Jeanette and her husband as he lay gravely ill.  Jack
20            passed away from cancer on January 19, 2008.

21   Second, counsel repeatedly refers to the term "lawsuit" used by Ms. Windell, yet counsel

22   for Cross-Defendants never asked her or Jeanette to define what she or Jeanette meant by

23   "lawsuit."  A non-legal trained person may very well be referring to the actions occurring,

24   leading up to and included in the lawsuit as well as the filing of the lawsuit itself.  The term

25   "lawsuit" is a conclusion or summary of a chain of events.  The context of Ms. Windell's

26   deposition testimony, certainly suggests such.  She never purported to limit her statement in

27   some legalistic confines of the act of suing and prosecuting the action, nor did she ever say

28   Jeanette was so limiting her problems when referring to the "lawsuit."  To claim that

Rutan & Tucker, LLP
attorneys at law

034/026716-0001
2309505.1 a09/19/11                    -11-

Cross-Complainant's Ps&As in Opposition to
Cross-Defendants' Motion For Partial Summary
Judgment

1  someone who endured what Jeanette Johnson has from the Cross-Defendants, while she

2  had life-threatening cancer and her husband was dying and in fact did die from cancer did

3  not suffer severe emotional distress from the acts of Cross-Defendants whose acts they do

4  not deny defies common sense.  At the very least it is a jury issue of fact and not a legal

5  conclusion of law for the court to decide now.  As stated in the report (Ex. 2 to Ms.

6  Rothauge's declaration) underlying all her current emotional and physical stress lies her

7  fear of "losing everything because of this lawsuit when I didn't do anything wrong.  As a

8  result, Jeanette appears almost emotionally paralyzed because of this fear . . . and has a hard

9  time moving forward with her life.  She lost her husband nearly three years ago and hasn't

10  been able to adequately go through the grieving process because of this major lawsuit

11  weighing so heavily on her shoulders."

12      Third, although it makes sense that Jeanette Johnson is terribly stressed as a result of

13  watching her husband die of cancer and having to bear the burden of this lawsuit, that does

14  not minimize the emotional distress received at the hands of the Cross-Defendants leading

15  up to the lawsuit and continuing thereafter.  It is all part of the same.  Can anyone

16  reasonably state that a wife having undergone what she did and then seeing her husband

17  served with this lawsuit the day he returns home after brain surgery to remove the life

18  threatening cancer would not be severely distressed?  It is for the trier of fact after hearing

19  the evidence and weighing the credibility of the witnesses to determine the extent of the

20  emotional distress and the fair compensation therefor.

21      In fact, as Ellen Bradley-Windell testified, although Jeanette came initially to her to

22  deal with the death of her husband, her stress was also related to the "harassment and false

23  accusations."  Ms. Windell, however, was not there to deal with the "specifics" of the

24  causes but to teach Jeanette how to deal with her stress.

25          Q       What did she tell you about why she was
       coming to see you?

26

27          A       She had a terminally ill husband with cancer
       and she was feeling very overwhelmed with his care with the
       anticipated passing, that he would be passing away shortly

28       and feeling very anxious, very stressed about how
       incapacitated he was.

Rutan & Tucker, LLP
attorneys at law

034/026716-0001
2309505.1 a09/19/11

-12-

Cross-Complainant's Ps&As in Opposition to
Cross-Defendants' Motion For Partial Summary
Judgment

1 (See page 24, lines 12-18.)

2      Also testified by Ellen Bradley-Windell:

3           Q.    So is one of the major reasons that the lawsuit is so stressful is that she has a fear that she will lose all of her
4 monetary assets and the like?

5           A.    One aspect.

6           Q.    And how significant an aspect is that for her?

7           A.    I think, as of today, the - - I would say quite a bit, that it does impact here.  Because she's feeling very alone
8 with this and on her own.  Yes, that's part of it.

9           Q.    And have you already testified about what the other part of it is?
10

11           A.    No.

          Q.    Okay.  What the other part?
12

13           A.    That **the stress is mostly related to the harassment, the accusations of the - - in Jeanette's terms, the lies that, you know, that she's done things, that Jack
14 did things**.  She and I have never gotten into specifics about that because that really was not - - I didn't feel that the
15 specifics were really related to our treatment.  It was more about how she's going to deal with the stress - - how she is
16 dealing with the stress of all that.  But just feeling harassed, falsely accused, that there was lying and deceit on the part of
17 her previous employer, that she's being accused of things that they never knew about.
18

19      Again, financially, she just revealed to **me** recently this year, probably within the last month, that she - - apparently,
20 there was a partnership involved and that he - - her previous employer closed that company, and so she's lost a lot of
21 money in stock.  But again, I said to her those are issues - - **I kind of have to redirect her back to not so much content but the process of the therapy.**
22

23          So those are the specific issues, I believe, relating to the lawsuit that are really weighing on her.

24 (Page 85, line 10, to p. 86, line 21; emphasis added.)

25      Finally, in fact, counsel again specifically made it clear in her questions that the

26 treatment was not to deal with the allegations in the lawsuit or the causes of the stress but to

27 deal with her therapy.

28

1
> Q.    Did you make it clear to her about your
> sessions, that you wanted to deal with the facts that were
> important for her therapy and not about the allegations of the
> lawsuit?

2

3
> A.    I hope so, yes.

4

5   (P. 100, lines 8-12.)

6   **E.    There Is Sufficient Evidence For This Cause Of Action To Go To Trial.**

7   Unfortunately for Cross-Defendant, despite taking Jeanette Johnson's deposition for

8   three days Cross-Defendants were so intent on "beating her up" they simply failed to ask

9   the appropriate questions concerning the multiple acts of misconduct engaged in by the

10  Cross-Defendants, and, as the court will see, the moving papers are remarkably thin on

11  presenting any such evidence.  In fact, there are basically no denials of engaging in such

12  conduct or any reference in her deposition where she was impeached regarding any of her

13  claims.  The court should allow the evidence at trial and then determine if there is enough

14  to go to the jury, and it would be improper to rule now as a matter of law that Jeanette

15  Johnson suffered no severe actual stress at the hands and mouths of the Cross-Defendants.

16  2.    **THE COURT MUST DENY THE SUMMARY JUDGMENT AS TO THE**

17  **THIRD AND FOURTH CAUSES OF ACTION FOR MISAPPROPRIATION**

18  **OF NAMES IN VIOLATION OF CALIFORNIA CIVIL CODE SECTION**

19  **3344.**

20  California Civil Code section 3344 prohibits any person from knowingly using

21  another's name, signature, photograph, or likeness for the purpose of advertising, selling or

22  soliciting purchases of products, goods or services and provides for $750 penalty or actual

23  damages.  Cross-Defendants argument is contained at the bottom of page 6, line 28, of its

24  Points and Authorities as follows:

25
> There is simply no evidence that the failure to remove Dahl
> and Johnson's names from the Apex websites was anything
> but an innocent mistake.

26

27  The court is asked to accept on its face without seeing him in person the credibility of

28  Damon Zumwalt, who states under oath, "If Johnson and Dahl's names appeared on the

Rutan & Tucker, LLP
attorneys at law

034/026716-0001
2309505.1 a09/19/11

-14-

Cross-Complainant's Ps&As in Opposition to
Cross-Defendants' Motion For Partial Summary
Judgment

1   APEX website for any period of time after their respective resignations this was purely by

2   mistake and unintentional." In fact, the names remained on the website for at least 85 days,

3   despite two written demands that they be removed. Presented in evidence through

4   discovery by Cross-Complainants was a copy from Cross-Defendants' own website; the

5   first printout from February 28, 2008, Documents 000111-000113 (Exhibit 6 to Declaration

6   of Jeanette Johnson), and then copies of the website as of April 30, 2008, Document

7   000114 (Exhibit 9 to Declaration of Jeanette Johnson). How long thereafter it remained is

8   unknown. This occurred despite demands from Cross-Complainant's counsel of February

9   28, 2008, Document 000118, and March 5, 2008. The letter of February 28, addressed to

10  Cross-Defendants' first outside counsel in this matter, Rebecca Aragon, specifically stated

11  at the conclusion, on page 3:

12              Finally, it appears that APEX continues to list Mr.
            Dahl as executive vice president on APEX's website and that
13          CSC continues to list Ms. Dahl as public relations on its
            separate website (see enclosed example pages from these
14          websites). This publication is untrue, misleading and can
            cause confusion to customers and others in the business.
15          Please remove all references to Mr. Dahl and Ms. Johnson
            immediately.
16

17  Cross-Defendants ignored this demand and a follow up was sent to Ms. Aragon on March 5

18  by Mr. Dahl (Exhibit 8 to Declaration of Milford W. Dahl, Jr.) stating at page 4:

19              Finally, Jack advised that APEX continues to use their
            names and information on its website despite Mr. Paines
20          February 28 demand that they be removed. I would
            appreciate any efforts by you to have your client **immediately**
21          remove Jack and Jeanette's name from the websites.

22  Despite this second demand, Cross-Defendants left the names on the website until

23  sometime after April 30, at least seven weeks later! Certainly no "innocent mistake."

24

25

26

27

28

Rutan & Tucker, LLP
attorneys at law

034/026716-0001
2309505.1 a09/19/11

-15-

Cross-Complainant's Ps&As in Opposition to
Cross-Defendants' Motion For Partial Summary
Judgment

3.  **THE COURT SHOULD DENY SUMMARY JUDGMENT AGAINST JOHNSON'S SEVENTH CAUSE OF ACTION FOR FAILURE TO PAY OVERTIME WAGES AND EIGHTH CAUSE OF ACTION FOR FAILURE TO PROVIDE ITEMIZED WAGE STATEMENTS ON THE GROUNDS SHE WAS AN EXEMPT EMPLOYEE.**

The Cross-Defendants' assertion that Jeanette Johnson was an exempt employee is considered as a matter of law to be an affirmative defense and the employee has the burdened of pleading and proving the same. *Ramirez v. Yosemite Water Co.,* 20 Cal. App. 4th 785, 794-795 (1999). Here, Cross-Defendants failed to plead such an affirmative defense and thus have waived and are barred from raising or arguing it particularly for the first time in a summary judgment motion. They have also failed to meet their burden to set forth the "facts" that would prove this defense. As stated in *Ramirez*:

> In interpreting the scope of an exemption from the state's overtime laws, we begin by reviewing certain basic principles. First, "past decisions . . . teach that in light of the remedial nature of the legislative enactments authorizing the regulation of wages, hours and working conditions for the protection and benefit of employees, the statutory provisions are to be liberally construed with an eye to promoting such protection." (*Industrial Welfare Com. v. Superior Court* (1980) 27 Cal.3d 690, 702 [166 Cal.Rptr. 331, 613 P.2d 579].) Thus, under California law, exemptions from statutory mandatory overtime provisions are narrowly construed. (*Nordquist v. McGraw-Hill Broadcasting Co.* (1995) 32 Cal.App.4th 555, 562 [38 Cal.Rptr.2d 221]; see also *Phillips Co. v. Walling* (1945) 324 U.S. 490, 493 [65 S.Ct. 807, 808, 89 L.Ed. 1095, 157 A.L.R. 876].)

There is no dispute that Jeanette Johnson was paid monthly and not hourly and received raises periodically. That, however, is not the test. Although not mentioned in the moving papers, there is also no dispute that she was an at-will employee hired under an oral contract and reported directly to the owner, majority shareholder and president of CSC. She was assigned specific tasks. Except during certain events when she was assisting APEX in providing credentialing services at the instruction of her bosses Damon Zumwalt and Jack Dahl, she did not exercise or have any managerial duties over any other employees. There is no evidence presented by Cross-Defendants that she supervised, as

1  opposed to managed at these events.  She provided specific services pursuant to specific

2  instructions and supervision emanating from her boss Damon Zumwalt and her husband

3  and boss Jack Dahl.  She did not have the authority to formulate, effect, interpret, or

4  implement management policies or operating practices as was Cross-Defendants admit they

5  must prove.  She did not hire or fire employees, negotiate contracts with Cross-Defendants'

6  customers or consult with them about business policies or practices.  No evidence has been

7  presented by Cross-Defendants that she did.  Contrary to the moving papers, she did not

8  testify she was not required to keep track of her hours of work, only that she did not have to

9  clock in and out or state when she started or finished.  In fact, she was required and did

10  submit hours worked during certain periods of her work, as Cross-Defendant needed to

11  submit those hours to third parties for whom it was performing services and charging

12  hourly rates.  (Exhibit 1 to Declaration of Jeanette Johnson.)

13         Labor Code section 204 establishes the fundamental right of all employees in the

14  State of California to be paid wages in a timely fashion for their work.  Labor Code section

15  510(a) states in pertinent part:  "Any work in excess of eight hours in one workday and any

16  work in excess of 40 hours in any one workweek shall be compensated at the rate of no less

17  than one and one-half times the regular rate of pay for any employee."  Pursuant to Labor

18  Code section 1197, payment of less than the minimum wage fixed by the Labor

19  Commission is unlawful.  CSC was required to pay Cross-Complainant for all hours

20  worked meaning the time during which she subject to the control of her employer, which

21  meant all the events including the substantial long hours at Super Bowl 2008.

22         She submitted her overtime request to in-house counsel, James Service, who never

23  denied her right to such and, in fact, he requested her to provide the backup documents for

24  her request.  (Exhibit 2 to Declaration of Jeanette Johnson.)  Whether Jeanette Johnson was

25  an exempt administrative employee as contended by Cross-Defendants presents a mixed

26  question of law and fact.  *Eicher v. Advanced Business Integrators, Inc.* 151 Cal. App. 4th

27  1363, 1369 (2007); *Ramirez v. Yosemite Water Co, supra,* 20 Cal. App. 4th 785 at 794.

28  Employees engaged in an activity that constitutes the company's primary purpose are most

Rutan & Tucker, LLP
attorneys at law

034/026716-0001
2309505.1 a09/19/11

-17-

Cross-Complainant's Ps&As in Opposition to
Cross-Defendants' Motion For Partial Summary
Judgment

1   likely production workers who are nonexempt. *Eicher v. Advanced Business Integrators,*

2   *Inc., supra,* 151 Cal. App. 4th at 1372-73. The factual pattern is akin to *Eicher* where the

3   defendant company's primary business was to sell software to venues, implement the

4   software, train the customer, and provide additional support. In the implementation phase

5   the defendant would send its employees to the customer's site to install and train the

6   customer based on the needs of the customer. Here, Damon Zumwalt and Jack Dahl would

7   send Jeanette Johnson to the site of the sporting event in question, such as the NFL Super

8   Bowl, with the idea of installing and implementing a credentialing service in accordance

9   with the needs of the customer. She did not hire or fire employees, negotiate contracts with

10  customers, nor did she consult with the Cross-Defendants or its customers about business

11  policies and practices as required by *Eicher, supra*, to be exempt, and no evidence to the

12  contrary has been presented by Cross-Defendants. Her hours were monitored during these

13  events as she was required to submit her hours since Cross-Defendants received payment

14  from the third parties for those hours.

15  4.      **THE COURT SHOULD DENY SUMMARY JUDGMENT AS TO THE**

16          **THIRTEENTH AND FOURTEENTH CAUSES OF ACTION FOR**

17          **RECOVERY OF EXPENSES**

18          Cross-Defendants ignore allegations of failure to reimburse out-of-pocket expenses

19  claiming these causes of action were only to recover monies spent defending this action.

20  Authority is cited that defense costs can only be recovered when a third party sues and not

21  when an employee's employer is sued. Actually, that is the situation here. Jeanette

22  Johnson was employed by CSC and is being sued by APEX, and Jack Dahl was employed

23  by APEX and is being sued by CSC. Furthermore, these causes of cause of action also seek

24  to recover out-of-pocket expenses advanced by Cross-Complainants in the performance of

25  their duties at Super Bowl 2008 and this comes directly under Labor Code section 2802(a)

26  which provides:

27              An employer shall indemnify his or her employee for
             all necessary expenditures or losses incurred by the employee
28           in direct consequence of the discharge of his or her duties, or
             of his or her obedience to the directions of the employer, even

Rutan & Tucker, LLP
*attorneys at law*

034/026716-0001
2309505.1 a09/19/11                                     -18-

Cross-Complainant's Ps&As in Opposition to
Cross-Defendants' Motion For Partial Summary
Judgment

1  though unlawful, unless the employee, at the time of obeying
   the directions, believed them to be unlawful.

2

3  Cross-Defendants made no effort to even discuss expenditures paid by Cross-Complainants

4  for out-of-pocket expenses incurred at Super Bowl 2008, and certainly have not presented

5  any evidence denying the same.

6  5.      **THE COURT MUST DENY THE SUMMARY JUDGMENT MOTION ON**

7          **THE FIFTEENTH CAUSE OF ACTION FOR BREACH OF FIDUCIARY**

8          **DUTIES.**

9          Again, Cross-Defendant set up a straw issue and then knocks it down claiming that

10 Dahl, as a minority shareholder, is suing as a derivative action.  There was never any intent

11 that this cause of action be a derivative claim, and he is not suing nor seeks any damages

12 for damage to the corporation.  Although Zumwalt has looted the corporation, diverted all

13 of its business to other sister corporations owned by him and drained the money for paying

14 his, CSC and APEX's legal expenses in this case, since all of this happened after the

15 lawsuit was filed it obviously would not be a part of it since no motion to amend was ever

16 made.  Such a suit is for another day depending on what happens with this case.

17         It is clear, and apparently there is no contention to the contrary, that Zumwalt

18 occupied a fiduciary position to Jack Dahl.  Indeed, *Jones v. H.F. Ahmanson & Co.*, 1 Cal.

19 3d 93, 81 Cal. Rptr. 592, 460 P.2d 464 (1969) specifically states at 108:

20                 Defendants take the position that as shareholders they
               owe no fiduciary obligation to other shareholders absent
21             reliance on inside information, use of corporate assets or
               fraud.  This view has long been repudiated by California.  The
22             Court of Appeal have often recognized that majority
               shareholders either singly or acting in concert to accomplish a
23             joint purpose, have a fiduciary responsibility to the minority
               and to the corporation to use their ability to control the
24             corporation in a fair, just and equitable manner.  Majority
               shareholders may not use their power to control activities to
25             benefit themselves alone or in any manner detrimental to
               minority.
26

27         As stated in *Smith v. Tele-Communication, Inc.*, 134 Cal. App. 3d 338, 345 (1982),

28 plaintiff's cross-complaint must be liberally construed with a view towards substantial

Rutan & Tucker, LLP
attorneys at law

034/026716-0001
2309505.1 a09/19/11                                    -19-

Cross-Complainant's Ps&As in Opposition to
Cross-Defendants' Motion For Partial Summary
Judgment

1   justice.  Furthermore, when a breach of fiduciary duty is alleged the fiduciary has the

2   burden of justifying his conduct.  (*Smith, supra,* 134 Cal. App. 3d at 345.)  Here, no effort

3   has been made in the motion to justify the conduct of Zumwalt.  Remember in this case

4   Jack Dahl was suing not only in his capacity as a minority shareholder but as an employee

5   (see paragraph 1 of the Cross-Complaint).  There was a duty to make the employment

6   payments sought by Jack Dahl.  (See *Reynolds v. Bement,* 36, Cal. 4th 1075, 1089 (2005).)

7   Certainly at a minimum not paying her his shareholder percentage share of earnings as

8   reflected in the K-1 (Exhibit 3 to Declaration of Jeanette Johnson) is a breach of duty and

9   individual recoverable damage.

10          Indeed, Cross-Defendants have cited no cases that hold that the nature of the conduct

11   and the damages sustained are not proper claims for Cross-Defendant Zumwalt's breach of

12   fiduciary duty.  In fact, the *Smith* case cited by Cross-Defendants in support of their motion,

13   specifically **reversed** the trial court which had sustained a demurrer without leave to amend

14   on the very basis that Cross-Defendants are contending here.  They are like here the court

15   "cannot say as a matter of law that the transactions engaged in by Zumwalt were fair, in

16   good faith and equitable to Jack Dahl."

17

18   Dated:  September 23, 2011                    RUTAN & TUCKER, LLP

19                                                                    By:  _____ /s/ Milford W. Dahl, Jr. _____

20                                                                            Milford W. Dahl, Jr.
                                                                              Attorneys for Defendants and Cross-
21                                                                            Complainants Jack Dahl, an individual, by
                                                                              Jeanette Johnson, as his successor in
22                                                                            interest, and Jeanette Johnson, in her
                                                                              individual capacity

23

24

25

26

27

28

Rutan & Tucker, LLP
*attorneys at law*

034/026716-0001
2309505.1 a09/23/11

-20-

Cross-Complainant's Ps&As in Opposition to
Cross-Defendants' Motion For Partial Summary
Judgment