RUTAN & TUCKER, LLP
Milford W. Dahl, Jr. (State Bar No. 36796)
mdahl@rutan.com
611 Anton Boulevard, Fourteenth Floor
Costa Mesa, California 92626-1931
Telephone:  714-641-5100
Facsimile:  714-546-9035

Attorneys for Defendants and Cross-Complainants
Jack Dahl, an individual, by Jeanette Johnson, as his successor in interest, and Jeanette Johnson, in her individual capacity

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EXECUTIVE SECURITY MANAGEMENT, INC., a California corporation, d/b/a The APEX Group and CONTEMPORARY SERVICES CORPORATION, a California corporation,<br><br>    Plaintiffs,<br>vs.<br>JACK DAHL, an individual, and JEANETTE JOHNSON, in her individual capacity and as successor in interest to Jack Dahl, POPULOUS HOLDINGS, INC., a Delaware corporation, formerly known as HOK Sport Venue Event, HOK Group, Inc., a Delaware corporation,<br><br>    Defendants.<br><br>AND RELATED CROSS-ACTION. | Case No. CV-09-9273-CAS-RCx<br><br>**DECLARATION OF JEANETTE JOHNSON FILED IN OPPOSITION TO CROSS-DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>**Filed concurrently with Cross-Complainant's Points And Authorities In Opposition To Cross-Defendant's Motion For Partial Summary Judgment; Reply to Amended Separate Statement of Uncontroverted Facts and Proposed Conclusions of Law and Separate Statement of Genuine Disputes; Objections to Testimony of Bridget Ott; and Declaration of Milford W. Dahl, Jr. filed in support thereof]**<br><br>DATE:  October 24, 2011<br>TIME:  10:00 a.m.<br>CTRM:  5<br><br>Date Action Filed: December 17, 2009 |

I, Jeanette Johnson, state and declare as follows:

### My Employment by Contemporary Services Corporation

1.    I was employed by Contemporary Services Corporation (CSC) by its owner and president Damon Zumwalt in 1998.  There was no written employment agreement.  It

Rutan & Tucker, LLP
attorneys at law

034/026716-0001
2314491.1 a09/19/11

-1-

Declaration of Jeanette Johnson Filed In
Opposition to Cross-Defendants' Motion For
Partial Summary Judgment

was an oral agreement terminable at will. Initially I was retained to assist with advertising for trade magazines based on my prior experience as a public affairs officer in Heidelberg, Germany, and marketing manager at Fort Drum, New York. There were never any specific written policies or any job descriptions. I was to and did report directly to Damon Zumwalt. He assigned me various duties throughout my employment. These duties did not include hiring or firing employees of CSC, negotiating contracts with its customers or consulting with CSC or its customers about business policies and practices.

2. Later, pursuant to instructions from Damon Zumwalt, I was required to report to and assist Jack Dahl, who was an owner, officer and employee of Executive Security Management, Inc. dba the APEX Group ("APEX") in handling credentialing at various public events, including NFL Super Bowls, NCAA men's and women's tournaments in 2007 and PGA tournaments.

3. I did not regularly exercise or have supervisory duties over other employees. Also, Damon Zumwalt hired Yvette Rocha who performed many varied services for CSC, APEX and on some services she and I worked together and she would assist me in performing my duties. During those events where I worked on credentialing on instruction from Jack Dahl, I had some temporary management duties with temporary employees hired by Jack Dahl, but at all times I reported to Jack Dahl. At no time did I have the authority to formulate, effect or implement management policies or operating practices for either CSC or Executive Security Management, Inc., nor did I do so. Jack Dahl managed and supervised each event.

4. At no time did I ever perform any services for Yucaipa Companies. I never spoke with or discussed business with anybody from Yucaipa Companies prior to my termination of employment with CSC. Neither Cross-Complainant ever provided credentialing services to Yucaipa. APEX provided security for certain properties owned by Yucaipa, but I was never involved in providing any of those services.

5. I was always employed and paid by CSC. I was never employed by APEX, although I performed services for APEX under the direction of Damon Zumwalt and Jack

Rutan & Tucker, LLP
attorneys at law

034/026716-0001
2314491.1 a09/19/11

-2-

Declaration of Jeanette Johnson Filed In
Opposition to Cross-Defendants' Motion For
Partial Summary Judgment

1  Dahl. My husband Jack Dahl was never employed by Cross-Complainant CSC. He died
2  from brain cancer in January 2009.

3      6. The additional services I performed for APEX, among others, were assisting
4  it in providing credentialing services to third parties at various events such as the NFL
5  Super Bowl, the NCAA men's and women's tournaments in 2007 and certain PGA
6  tournaments. I would be sent to the customer site to install a system and work with the
7  customer and train it in providing the credentialing services for each event based on the
8  specific needs of that customer.

9      7. Although I was not required to clock in and out of work, I was required to
10 keep and submit the hours worked during certain periods of my work at the various events
11 where I was working on credentialing. APEX was paid by the events for all my hours
12 spent. I did prepare and submit time records during such periods of time. (See, for
13 example, Exhibit 1 attached hereto and marked with Bates nos. 000149-000189, documents
14 previously produced in this case to Cross-Defendants by myself and Jack Dahl.)

15     8. At the time of my termination, Cross-Defendants failed to compensate me for
16 overtime incurred at Super Bowl 2008 as it had failed to do for Super Bowls 2005 to 2007
17 and failed and refused to pay me for my unused vacation, despite repeated requests by me.
18 I believe that I am entitled to overtime for the years 2007, 2008 in the total sum of
19 $10,001.45, representing time and a half for time worked. Also I am entitled to overtime
20 for 2006 in an amount unknown, as I do not have CSC's records of hours worked for 2006
21 Super Bowl.

22     9. I do not have a legal background. At the time of my deposition I was aware
23 there is a distinction between exempt and non-exempt employees. I have no legal or human
24 resource training. I testified truthfully in my deposition that I did not know whether I was
25 an exempt or non-exempt employee as I was unaware of the legal requirements for exempt
26 or non-exempt. At the time of my termination from APEX, I specifically made a claim to
27 in-house corporate counsel, Mr. James Service, asking for compensation for my hours
28 exceeding 40 over the past six weeks and vacation pay. He asked for the overtime hours I

Rutan & Tucker, LLP
attorneys at law
034/026716-0001
2314491.1 a09/19/11
-3-
Declaration of Jeanette Johnson Filed In
Opposition to Cross-Defendants' Motion For
Partial Summary Judgment

claimed and copies of the sign in sheets which have been provided and some of which are attached hereto as Exhibit 1, and he promised to pursue the matter further. He never denied my entitlement to overtime, however, he never got back to me, and I was never paid for same. Attached hereto as Exhibit 2, Bates stamped 000663-000664 are true and correct copies of an exchange of emails between us dated February 7, 2008.

10. Also, during Super Bowl 2008, as had been normal corporate practice for prior Super Bowls, my husband Jack Dahl and I each had use of company credit cards for various expenses including part-time employees' meals, mileage, lodging expenses, etc., as well as other miscellaneous expenses normally incurred at these events. However, contrary to prior Super Bowls, Cross-Defendants terminated our right to use those cards during the Super Bowl requiring us to take out of pocket sufficient funds to pay expenses to third parties. I do not know the exact amount because the expense reports that were turned with required back up were never produced to us despite discovery requests for the same. I believe they exceed $10,000.

11. In addition, APEX, by its majority owner Damon Zumwalt, promised to pay my husband Jack Dahl a minimum annual bonus equivalent to 10 percent of the profit earned by APEX each year. Such bonuses were paid until the years ending 2007-2008.

12. The profits for the 2007 as reported by APEX to the IRS were approximately $150,000, which would entitle Jack Dahl to a bonus in that year of $15,000. See Exhibit 3, which is the K-1 provided by APEX. I withdraw any contention for a 2008 bonus for Jack Dahl. Jack Dahl was never paid for his share of the 2007 year-end profit of $19,369.00, and we had to pay income taxes for the same.

### Treatment By My Therapist Ellen Bradley-Windell

13. I first sought treatment from Ellen Bradley-Windell, a licensed psychologist, in approximately November 2008 primarily to assist me with the grieving process and the emotional distress occurring from the death of my husband Jack Dahl. I have worked with her on a continuing basis through this date. Although my primary issues dealt with my life after the death of Jack Dahl, I discussed with her the issues involved in the lawsuit and the

Rutan & Tucker, LLP
attorneys at law

034/026716-0001
2314491.1 a09/19/11

-4-

Declaration of Jeanette Johnson Filed In
Opposition to Cross-Defendants' Motion For
Partial Summary Judgment

extreme stress such created. When I used the word "lawsuit" I never limited my distress to that occurring from the proceedings in the lawsuit itself but included all of the acts that were a part of and led up to the lawsuit. My stress also admittedly emulated from subsequent acts by Cross-Defendants, including deliberately serving my husband with this lawsuit personally at home the day he returned home from brain surgery for his cancer, a time and event they were well aware of and knowing he was represented by counsel. I never intended the word "lawsuit," nor based on my sessions with her did I believe did Ms. Windell interpreted the word "lawsuit" to be limited to the actual prosecution by Cross-Defendants of this unjust and unmeritorious lawsuit as Cross-Defendants now appear to be contending.

### Emotional Distress

14.     Although initially my employment with CSC was uneventful and my relationship with Damon Zumwalt was harmonious, this all began to change early on in my employment and was exasperated and accelerated when I contracted breast cancer. The atmosphere at the offices of the Cross-Defendants was one of a "man's world" where women were not respected and constantly subject to demeaning behavior by Damon Zumwalt personally as well as other male officers and supervisors. There was a constant borage of improper racist and sexual emails. A few examples have been produced in this case by me and are attached hereto as Exhibit 4, Bates nos. 00042 - 00056. My employer CSC even received complaints of racism. See Exhibit 5, Bates nos. 00057 – 00059. Although Mr. Zumwalt continued to pay my salary as long as I continued to work long hours without complaint, he violated my privacy and discussed my breast cancer with other employees and stated that I and my husband Jack, who was suffering from life-threatening cancer, were a drain on the company's profits because of the large medical bills that were being covered by the companies' health insurance programs. He became more aggressive in his negative behavior as to me and Jack personally after CSC lost the security contract with the NFL Super Bowl as a result of the misconduct of Damon Zumwalt, while APEX, due to the excellent relationship that Jack and I had with the NFL was able to maintain the

Rutan & Tucker, LLP
attorneys at law

034/026716-0001
2314491.1 a09/19/11

-5-

Declaration of Jeanette Johnson Filed In
Opposition to Cross-Defendants' Motion For
Partial Summary Judgment

credentialing contract for the Super Bowls. In fact, Mr. Zumwalt, individually and by his various officers including in-house counsel James Services, engaged in each and all of the acts that are alleged in the second cause of action (paragraph 32) virtually none of which, other than paragraph 32(a), was I questioned about by Cross-Defendants' counsel in three days of my deposition.

15.  As a result of said actions by the Cross-Defendants I suffered and continue to suffer severe emotional distress, which no doubt contributed to my difficult medical condition emanating from my breast cancer.

### Use Of My And Jack's Names To Advertise On Cross-Defendants' Website

16.  I personally observed on multiple occasions that despite our terminations Cross-Defendants' continued to list me and Jack as employees on their website. A true and correct copy of the websites of CSC and APEX, which I personally copied off their website February 28, 2008, Bates nos. 000111-000113 and produced to Cross-Defendants is attached hereto as Exhibit 6. When our names were not removed, despite a letter from our counsel requesting they be removed, Exhibit 7, Bates nos. 000118-000119. I observed no changes had been made as of March 5, so our counsel sent a second demand. (Exhibit 8, Bates nos. 001502-001506.) As of April 30 our names were still there and attached hereto as Exhibit 9 is a true and correct copy, which I personally made of such, Bates no. 00014. Sometime later, on a date unknown to me, Cross-Defendants finally removed our names.

I declare under penalty of perjury under the laws of the United States that the statements contained herein are true and correct.

Executed this 19th day of September 2011, at Valencia, California.

_Jeanette Johnson_
Jeanette Johnson

Rutan & Tucker, LLP
attorneys at law

034/026716-0001
2314491.1 a09/19/11

-6-

Declaration of Jeanette Johnson Filed In
Opposition to Cross-Defendants' Motion For
Partial Summary Judgment