# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 09-9273 CAS (RCx) | Date | November 15, 2011 |
|---|---|---|---|
| Title | EXECUTIVE SECURITY MANAGEMENT, INC., ET AL. v. JACK DAHL, ET AL. | | |

| Present: The Honorable | CHRISTINA A. SNYDER, U.S. DISTRICT JUDGE | |
|---|---|---|
| RITA SANCHEZ | N/A | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| N/A | N/A |

**Proceedings:** **(In Chambers:) DEFENDANT JOHNSON'S MOTION FOR SUMMARY JUDGMENT** (filed 8/5/2011)

**DEFENDANT POPULOUS' MOTION FOR SUMMARY JUDGMENT** (filed 8/5/2011)

## I.   INTRODUCTION

On April 9, 2008, plaintiffs Executive Security Management, Inc., d/b/a The APEX Group ("Apex"), and Contemporary Services Corporation ("CSC") filed the instant action in Los Angeles County Superior Court. With leave of court, plaintiffs filed a first amended complaint ("FAC") on November 11, 2009, against Jack Dahl ("Dahl"); Jeanette Johnson, in her individual capacity and as successor in interest to Dahl ("Johnson"); Populous Holdings, Inc., formerly known as HOK Sport Venue Event ("Populous"); HOK Group, Inc. ("HOK Group"); Juan Melendez ("Melendez"); and Yvette Rocha ("Rocha"). On December 17, 2009, Populous timely removed the instant action to this Court. On February 8, 2010, the Court granted in part and denied in part defendants' motion to dismiss the FAC.

On March 10, 2010, plaintiffs filed a Second Amended Complaint ("SAC") against all defendants except Melendez and Rocha who were not named in the SAC. Plaintiffs' SAC alleges the following claims: (1) breach of fiduciary duty against Dahl and Johnson; (2) conversion against all defendants; (3) intentional interference with contract against all defendants; (4) intentional interference with prospective economic advantage against Dahl and Johnson; (5) intentional interference with prospective economic advantage against Populous and HOK Group; (6) violation of the Computer Fraud and Abuse Act,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-9273 CAS (RCx) | Date | November 15, 2011 |
|----------|----------------------|------|-------------------|
| Title | EXECUTIVE SECURITY MANAGEMENT, INC., ET AL. v. JACK DAHL, ET AL. | | |

18 U.S.C. § 1030 et seq. ("CFAA"), against Dahl and Johnson; (7) interception of communications in violation of the Wiretap Act, 18 U.S.C. § 2510 et seq., against Dahl and Johnson; (8) unlawful access to stored communications in violation of the Electronic Communications Privacy Act ("ECPA"), pursuant to 18 U.S.C. § 2707, against Dhal and Johnson; (9) unfair competition in violation of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq. ("UCL") against all defendants; and (10) successor liability against Johnson.

On August 1, 2011, the parties entered into a stipulation to dismiss certain claims with prejudice. Specifically, plaintiffs dismissed the following claims: CSC dismissed all of its claims against Populous and HOK; Apex dismissed its third claim for intentional interference with contractual relations as to Populous and HOK; plaintiffs retained their third claim for intentional interference with contractual relations as to Dahl and Johnson, but stipulated to limit it to claims arising out of Dahl and Johnson's relationship with the Yucaipa Companies and LJFRP, LLC; and CSC and Apex dismissed their claims for punitive damages against Dahl and Johnson in her capacity as successor-in-interest to Dahl, but retained their claims for punitive damages against Johnson in her individual capacity.

On August 5, 2011, Populous filed a motion for summary judgment as to plaintiffs' second, fifth, and ninth claims. Also on August 5, 2011, Johnson filed a motion for summary judgment as to the entire SAC. Plaintiffs opposed both motions on September 26, 2011, and defendants filed separate replies on October 11, 2011. After carefully considering the parties' arguments, the Court finds and concludes as follows.

## II.   BACKGROUND

Plaintiffs allege that Dahl and Johnson, husband and wife, respectively, are former employees of plaintiffs Apex and CSC.[1]  SAC ¶ 1. Apex is a corporation that provides

---

[1] Plaintiffs allege that Dahl is now deceased, and that upon his death, all of his separate property and community property passed by law to his spouse Johnson. SAC ¶¶ 4, 6. Accordingly, plaintiffs allege that all claims against Dahl are also alleged against Johnson, as his successor in interest. Id.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-9273 CAS (RCx) | Date | November 15, 2011 |
|----------|----------------------|------|-------------------|
| Title | EXECUTIVE SECURITY MANAGEMENT, INC., ET AL. v. JACK DAHL, ET AL. | | |

executive security, event security, and event accreditation services at concerts and sporting events. Id. ¶ 10. CSC is a corporation that provides event staffing, security, and crowd management for concerts and sporting events. Id. ¶ 11. According to plaintiffs, at all times relevant to this case, Damon Zumwalt ("Zumwalt") was the Chairman and Chief Executive Officer of Apex and CSC. Id. ¶ 12. Until his suspension and subsequent resignation on February 11, 2008, Dahl was employed by Apex as Vice President and Secretary, and served as a member of Apex's Board of Directors. Id. ¶ 13. Johnson was employed by CSC as Director of Marketing and Public Relations until she was suspended and resigned on February 4, 2008. Id. ¶ 14. Plaintiffs allege that after their resignations, both Dahl and Johnson became employed by defendant Populous, a competitor of plaintiffs that provides event management and accreditation services at civic, entertainment, and sporting events.[2] Id. ¶¶ 13–14. The gravamen of plaintiffs' complaint is that Dahl and Johnson, over the course of their respective employment with Apex and CSC, "engaged in a campaign to discredit plaintiffs" in the eyes of its clients and employees, "interfered with plaintiffs' relationship with its clients and employees, stole plaintiffs' confidential and proprietary information and property, erased plaintiffs' data and other information from their computer systems, and illegally intercepted confidential e-mail communications, all in an attempt to enrich themselves and to secure the business of plaintiffs' clients for their own purpose of setting up a competing business." Id. ¶ 1.

Specifically, plaintiffs allege that on January 27, 2008, while providing credentialing services to the National Football League ("NFL") for the Super Bowl on behalf of Apex, Dahl and Johnson made "numerous misrepresentations to the NFL concerning Zumwalt and the ability of Apex to provide services to the NFL." Id. ¶ 16. Plaintiffs further allege that at this time, Zumwalt attempted to enter Apex's credentialing office at the Super Bowl in Phoenix Arizona but Dahl and Johnson prevented him from so doing. Id. ¶ 17. In addition, plaintiffs allege that on February 22, 2008, Dahl and Johnson contacted plaintiffs' client the Professional Golf Association ("PGA") and made similar misrepresentations to the PGA, "including false statements concerning Zumwalt's mental capacity, his control of his faculties, and the ability of Zumwalt and

---

[2] Plaintiffs allege that HOK Group was the parent company of Populous, until they separated in December 2008. SAC ¶¶ 8, 31

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-9273 CAS (RCx) | Date | November 15, 2011 |
|---|---|---|---|
| Title | EXECUTIVE SECURITY MANAGEMENT, INC., ET AL. v. JACK DAHL, ET AL. | | |

Plaintiff Apex to provide credentialing and other services to the PGA."[3]  Id. ¶ 19.
According to plaintiffs, Dahl and Johnson managed Apex "in a manner to benefit
themselves and facilitate their setting up a competing business," which included
preventing other employees from being involved in credentialing services.  Id. ¶¶ 23–24.
Plaintiffs aver that during the 2007 and 2008 Super Bowls, Dahl and Johnson withdrew
substantial sums from Apex's corporate account to improperly use for their own benefit.
Id. ¶ 25.  Further, according to plaintiffs, around the time Dahl and Johnson were
suspended from their employment duties, they erased files on the computer provided to
Dahl by Apex; removed proprietary and confidential files related to other Apex's
contracts and accounts; and misappropriated a backup computer hard drive attached to
Zumwalt's computer.  Id. ¶¶ 26–28.  After their resignations, Dahl and Johnson allegedly
immediately joined plaintiffs' competitor, Populous, and brought with them Apex's
"confidential and proprietary files and materials with them."  Id. ¶ 32.  Plaintiffs allege
that Populous has since used this misappropriated information—with full knowledge of
how it was obtained—to procure a contract with Apex's client, the NFL, and interfered
with Apex's relationship with the PGA, thus causing Apex to lose its longstanding
contracts with the PGA.[4]  Id. ¶ 35.  Finally, plaintiffs allege that Dahl and Johnson
improperly and secretly retained, without authorization, access to the e-mail accounts of
Zumwalt and James Service, plaintiffs' general counsel.  Id. ¶¶ 41–46.  According to
plaintiffs, during the 2008 Super Bowl Dahl wrongfully obtained an e-mail that had been
sent to a limited number of people.  Id.

## III.  LEGAL STANDARD

　　　Summary judgment is appropriate where "there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.
56(a).  The moving party has the initial burden of identifying relevant portions of the
record that demonstrate the absence of a fact or facts necessary for one or more essential

---

　　　[3] Further, plaintiffs allege that Dahl and Johnson made similar misrepresentations
to other clients, including Ron Burkle of Yucaipa and the Fiesta Bowl.  SAC ¶¶ 21–22.

　　　[4] Plaintiffs allege that Populous' knowledge of the confidential material and
benefits therefrom ratifies the acts of Dahl and Johnson.  SAC ¶ 36.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-9273 CAS (RCx) | | Date | November 15, 2011 |
|---|---|---|---|---|
| Title | EXECUTIVE SECURITY MANAGEMENT, INC., ET AL. v. JACK DAHL, ET AL. | | | |

elements of each cause of action upon which the moving party seeks judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the moving party meets its initial burden, the opposing party must then set out specific facts showing a genuine issue for trial in order to defeat the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); see also Fed. R. Civ. P. 56(c), (e).  The nonmoving party must not simply rely on the pleadings and must do more than make "conclusory allegations [in] an affidavit." Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990); see also Celotex, 477 U.S. at 324.  Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322; see also Abromson v. Am. Pac. Corp., 114 F.3d 898, 902 (9th Cir. 1997).

In light of the facts presented by the nonmoving party, along with any undisputed facts, the Court must decide whether the moving party is entitled to judgment as a matter of law.  See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 631 & n.3 (9th Cir. 1987).  When deciding a motion for summary judgment, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted); Valley Nat'l Bank of Ariz. v. A.E. Rouse & Co., 121 F.3d 1332, 1335 (9th Cir. 1997).  Summary judgment for the moving party is proper when a rational trier of fact would not be able to find for the nonmoving party on the claims at issue.  See Matsushita, 475 U.S. at 587.

## IV. DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Johnson moves for summary judgment on each of plaintiffs' ten claims and Populous moves for summary judgment on plaintiffs' second, fifth, and ninth claims.[5] Each claim is discussed in turn.

---

[5]The Court will address each claim as it relates to defendants Dahl and Johnson and incorporate Populous' arguments where applicable.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-9273 CAS (RCx) | Date | November 15, 2011 |
|---|---|---|---|
| Title | EXECUTIVE SECURITY MANAGEMENT, INC., ET AL. v. JACK DAHL, ET AL. | | |

A.    **First Claim for Breach of Fiduciary Duty Against Dahl and Johnson**

To establish a claim for breach of fiduciary duty, a plaintiff must prove: (1) the existence of a fiduciary duty; (2) a breach of that duty; and (3) damage caused by the breach. Pellegrini v. Weiss, 165 Cal. App. 4th 515, 524 (Cal. Ct. App. 2008). The parties do not dispute that as a corporate officer, Dahl owed Apex a fiduciary duty.

Apex alleges that Dahl breached his fiduciary duty by interfering with Apex's business relationships while he was an officer and director of Apex. SAC ¶ 49. According to Apex, Dahl used its confidential information to set up a competing business which caused Apex to lose revenue from former clients (including the NFL, NCAA, PGA, and Yucaipa). See id. ¶ 50. Apex further avers that Dahl solicited Apex employees to leave Apex and work for Dahl by using Apex's money to pay unauthorized bonuses and gain the employees' loyalty during the 2007 and 2008 Super Bowls. Id. ¶¶ 24, 51.

Johnson argues that Dahl did not breach his fiduciary duties to Apex because Apex has not produced any evidence as to which employees Dahl allegedly solicited and further asserts that Dahl's alleged "unauthorized" bonuses were appropriately paid pursuant to his discretion and therefore were insulated by the business judgment rule. See Johnson's Motion for Summary Judgment ("J. Mot.") at 5–7. Moreover, Johnson argues that each entity (such as the NFL) terminated its relationship with Apex for reasons "having nothing to do with Dahl's alleged actions." Id. at 4.

Apex responds that the business judgment rule does not shield Dahl's breaches because he acted in his own self interest. See Apex's Opp'n to J. Mot. ("Pl. Opp'n 1") at 2–3. Apex maintains that Dahl improperly used Apex's funds—totaling $149,999 in unauthorized bonuses during the 2007 and 2008 Super Bowls—to solicit Apex employees to leave. Id. at 4. Moreover, Apex contends that Dahl lied to the NFL for self-interested reasons adverse to Apex's interests. Id. at 5.[6]

---

[6]The allegation that Dahl lied to the NFL is set forth more fully in plaintiffs' fourth claim. Accordingly, the Court addresses this allegation in connection with plaintiffs' fourth claim.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-9273 CAS (RCx) | Date | November 15, 2011 |
|---|---|---|---|
| Title | EXECUTIVE SECURITY MANAGEMENT, INC., ET AL. v. JACK DAHL, ET AL. | | |

The Court finds that there is a triable issue of fact as to whether Dahl breached his fiduciary duties to Apex related to alleged overpayments during the 2007 and 2008 Super Bowls. "The business judgment rule does not shield actions taken without reasonable inquiry, with improper motives, or as a result of a conflict of interest." Everest Investors 8 v. McNeil Partners, 114 Cal. App. 4th 411, 430 (Cal. Ct. App. 2003). Here, Apex is alleging that Dahl acted with "improper motives" and as a result of a "conflict of interest" by distributing excessive per diem funds to Apex employees during the 2007 and 2008 Super Bowls. It is uncontested that after Dahl left Apex, some of his employees followed him to Populous. Apex has adequately set forth the deposition testimony of Apex and CSC's chief financial officer Granier, who testified that his own internal investigation revealed that Dahl had overpaid employees during the 2008 Super Bowl by approximately $75,000. See Declaration of Ronald L. Richman ("Richman Decl."), Exh. 15(c) at 64 (transcript of Granier deposition).[7] Although defendants contend that Johnson's deposition testimony establishes that the overpayments were a "mistake" and that Dahl asked Apex general counsel Jim Service to correct the mistake before the final payments were issued, Johnson admits that this "was never done" and that the employees indeed received higher per diem stipends during the 2008 Super Bowl. Id. Exh. 10(e) at 8 (transcript of Johnson deposition). Thus, there is a question of fact whether Dahl's overpayments at the 2008 Super Bowl constituted a breach of his fiduciary duties to withstand summary judgment.[8]

Accordingly, Johnson's motion is DENIED as to plaintiffs' first claim.

**B.    Second Claim for Conversion Against All Defendants**

---

[7]Contrary to defendants' assertion, Granier possesses the requisite personal knowledge because he testified that he conducted the investigation himself after Dahl had left Apex. Richman Decl., Exh. 15(c) at 64.

[8]There is also a question as to whether Dahl and Johnson overpaid employees during the 2007 Super Bowl. It is unclear when Dahl and/or Johnson became unhappy with their employment with Apex, and it is a question of fact whether Dahl and Johnson contemplated overpaying, and in fact overpaid, employees during the 2007 Super Bowl for any improper purpose.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-9273 CAS (RCx) | Date | November 15, 2011 |
|---|---|---|---|
| Title | EXECUTIVE SECURITY MANAGEMENT, INC., ET AL. v. JACK DAHL, ET AL. | | |

To prove a claim for conversion, a plaintiff must prove: (1) a plaintiff's ownership or right to possession of tangible property at the time of the alleged conversion; (2) a defendant's wrongful taking or disposition of the property; and (3) resulting damage. PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP, 150 Cal. App. 4th 384, 395 (Cal. Ct. App. 2007).

Apex alleges that Dahl and Johnson "converted a portion of [Apex's] money for their own purposes" in relation to the alleged overpayments at 2007 and 2008 Super Bowls. SAC ¶ 25. Apex further alleges that Dahl and Johnson "wrongfully exercised control" over plaintiffs' property by removing its documents, data, files, materials, money, back-up hard drives, and other property, and by erasing data files, programs, and systems from plaintiffs' computers without authorization. Id. ¶ 55. Plaintiffs aver that Dahl and Johnson transferred those materials to Populous, which thereafter "assumed control and ownership of the confidential and proprietary information and data" and converted it to its own use by using Apex's pricing models to secure NFL and NCAA contracts. Id. ¶ 58. According to plaintiffs, defendants have refused to return the "confidential and proprietary" materials. Id. ¶ 59.

### 1.    Conversion as to Dahl and Johnson

Johnson argues that summary judgment is warranted because the SAC fails to specify whether Dahl or Johnson converted Apex's monies. J. Mot. at 9. Moreover, Johnson argues that Apex has failed to identify what data, files, contracts, thumb drives, hard drives, money, or other items were specifically converted by Dahl and Johnson. Id. at 8. In other words, Johnson argues that Apex cannot prove specifically which defendant converted what property. Id.

Apex responds that Dahl and Johnson's alleged overpayments at the 2007 and 2008 Super Bowls constitutes conversion because they used the money for their own purposes—i.e., to "lure Apex employees to leave Apex and join Populous." Pl. Opp'n 1 at 10. Apex further argues that Dahl and Johnson erased all data from their laptops, making it impossible for Apex "to retrieve any documents, data, communications, contracts, draft contracts or e-mails" from them. Id. Moreover, Apex contends that Dahl and Johnson tampered with and damaged printers Apex planned to use for the PGA Championship and Ryder Cup Tournaments in 2008, causing Apex to fail to complete its

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-9273 CAS (RCx) | Date | November 15, 2011 |
|---|---|---|---|
| Title | EXECUTIVE SECURITY MANAGEMENT, INC., ET AL. v. JACK DAHL, ET AL. | | |

job in a timely fashion.  Id. at 10–11.  According to Apex, those printers were used without a problem during the 2008 Super Bowl, but were tampered with by Dahl and Johnson before sending them to Florida for the golf tournaments.  Id.

In reply, Johnson argues that Apex has not produced any evidence that Dahl or Johnson's deletion of files resulted in any harm to Apex.  J. Reply at 5.  Furthermore, Johnson contends that none of Apex's evidence regarding the alleged damage to Apex's printers would permit a jury to conclude that Dahl and Johnson caused the damage.  Id. at 6–7.  Finally, Johnson asserts that Apex has failed to produce evidence establishing that Johnson tampered with PGA Tour data to the detriment of Apex.  Id. at 7–8.

The Court finds that there is a triable issue of fact as to Dahl's alleged conversion of Apex's funds during the 2007 and 2008 Super Bowls for the reasons outlined above.  See supra, Section IV-B.  If Dahl breached his fiduciary duty to Apex by overpaying per diem stipends in an effort to lure away Apex's employees, his conduct may also constitute conversion.  See PCO, Inc., 150 Cal. App. 4th at 396 (noting that misappropriation of money constitutes conversion).

There is also a triable issue as to Dahl and Johnson's alleged destruction of Apex's printers following the 2008 Super Bowl and prior to the PGA Ryder Cup.  Dan Sidders, CSC's VP of special events, testified that certain printers that had been in working condition during the 2008 Super Bowl no longer worked after being shipped to Florida for the PGA Ryder Cup.  Richman Decl., Exh. 16(e) (Sidders Deposition) at 129, 155.  Although defendants contend Sidders could not have known about the condition of the printers during the 2008 Super Bowl because he admitted he was not present, he testified that "if [the printers] hadn't been working, we would have known about it, and by we, I mean the company."  Id. at 129.  Sidders testified that Dahl and Johnson were always "extremely careful" with their equipment, giving rise to his inference that they intentionally tampered with them following the 2008 Super Bowl.  Id. at 128; see also id. Exh. 7(b) (deposition of CSC VP Granger) at 93, 129 (testifying that the Super Bowl credentialing site maintained 24 hour security and that when he arrived at the scene following the Super Bowl, Dahl and Johnson had already packed up the printers)).  Sidders' and Granger's testimony thus provide evidence on which a rational jury could

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-9273 CAS (RCx) | Date | November 15, 2011 |
|----------|----------------------|------|-------------------|
| Title | EXECUTIVE SECURITY MANAGEMENT, INC., ET AL. v. JACK DAHL, ET AL. | | |

determine that Dahl and Johnson damaged, i.e. converted, the printers.[9]  See Rest. 2d Torts § 226 ("One who intentionally destroys a chattel or so materially alters its physical condition . . . is subject to liability for conversion.").

Finally, there is a triable issue as to whether Johnson's alleged tampering with Apex's computerized PGA data amounts to conversion.  Although plaintiffs contend in their opposition that Apex was unable to print credentials in a timely manner for the 2008 Ryder Cup "[b]ecause the printers were damaged," and not due to missing photos or other missing data, at other places it is unclear whether Apex's failure was a result of the printer damage, corrupt data, or both.  Pl. Opp'n 1 at 11.  See Richman Decl., Exh. 16(a) (deposition of Sarah Sidders) at 103–04 (testifying that while Apex waited on fixing the printers, "we started looking at the data . . . and the goal was to be prepared with the data once the printers came back . . . [but t]he data was corrupt and had missing information . . . there were a lot of photos that were not the actual people"); at 242 ("[When] you would actually click on the photo, the photo would no longer be there."); id. Exh. 16(b) at 241 ("[T]here were a significant number of photos missing . . . some pictures did not correspond to the actual person.") The testimony of the PGA's Vicki Ray-Crist corroborates Sarah Sidders' contention that corrupted data caused further delays.  Id. Exh. 9(d) (deposition of Vicki Ray-Crist) at 164 (testifying as to her exasperation with Apex's failure to print photos and stating that "I thought maybe [the data] was corrupt" and that she believed Sarah Sidders when Sidders told her the data had been corrupted).  Although Apex has not identified any specific individuals whose credential photos were missing or any other specific data that was lost due to Johnson's alleged tampering, there is still a triable issue as to whether Dahl and Johnson's alleged corruption of the data generally caused a delay in Apex's credentialing services to form the basis for plaintiffs' conversion claim.  See Zenith Radio Corp., 475 U.S. at 587 ("[T]he inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.").

---

[9]Moreover, Johnson's contention that there were 36 people working in the credentialing center during the 2008 Super Bowl, any one of whom could have damaged the printers, does not change the Court's decision.  A rational jury could find, for example, that Dahl and Johnson were the only employees who had any motive to tamper with the printers.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-9273 CAS (RCx) | Date | November 15, 2011 |
|----------|----------------------|------|-------------------|
| Title | EXECUTIVE SECURITY MANAGEMENT, INC., ET AL. v. JACK DAHL, ET AL. | | |

In accordance with the foregoing, Johnson's motion for summary judgment is DENIED as to Apex's second claim.

## 2. Conversion as to Populous

Apex alleges that Populous converted Apex's confidential and proprietary pricing information for prior Super Bowl credentialing contracts when bidding for (and securing) the 2009 Super Bowl credentialing contract. Pl. Opp'n to Pop. Mot. ("Pl. Opp'n 2") at 12–13. According to Apex, the "only way" Populous could have put itself in a position to successfully bid on the 2009 NFL contract "was to wrongfully obtain and use" Apex's previous pricing models. Id. Apex contends that on March 10, 2008, Dahl forwarded to Populous an email containing the 2008 Super Bowl contract that included Apex's pricing model, which Populous thereafter used to secure the 2009 contract. Id. at 13. Moreover, Apex argues that Populous similarly converted its pricing models from the 2007 NCAA Men's and Women's Final Four tournament contracts to procure the 2008 contract for itself. Id. at 14. Apex asserts that "Johnson, now acting on behalf of Populous, used Apex's 2007 specific pricing information and model" to "steal away" the Final Four contracts and bring them to Populous. Id.

Populous responds that Apex has ignored "two key elements" of its conversion claim: whether it owned the allegedly converted information, and whether such use caused the damages alleged. Pop. Reply at 18; see PCO, Inc., 150 Cal. App. 4th at 395 (listing three elements of a claim for conversion). As to ownership, Populous contends that "Apex's contracts with the NFL make clear that the NFL owns the information in the contract." Pop. Reply at 18. Furthermore, Populous argues that the NFL disengaged Apex's services for reasons other than Populous using its pricing models. Id. at 19. Populous asserts the same ownership and causation arguments as to the NCAA Final Four contracts. Id. at 20–21.

The Court finds that summary judgment is warranted in favor of Populous on Apex's conversion claim. The uncontroverted testimony from NFL and NCAA officials demonstrates that Populous' alleged use of Apex's pricing models had nothing to do with those entities terminating their relationships with Apex. In other words, Populous' alleged "conversion" of Apex's pricing models for its own gain did not give rise to the "resulting damages" claimed by Apex. PCO, Inc., 150 Cal. App. 4th at 395.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-9273 CAS (RCx) | Date | November 15, 2011 |
|---|---|---|---|
| Title | EXECUTIVE SECURITY MANAGEMENT, INC., ET AL. v. JACK DAHL, ET AL. | | |

First, each year the NFL invites various entities to bid on the next year's Super Bowl contract. Neither party disputes that the NFL's Frank Supovitz, the man in charge of inviting companies to bid for the credentialing contracts, did not invite Apex to bid on the 2009 contract because he understood that Apex CEO Zumwalt had "inappropriately" requested an all-access credential for the 2008 Super Bowl. Pop. Statements of Uncontroverted Facts ("Pop. SUF") ¶ 14.[10] Populous's alleged use of Apex's pricing model occured weeks later, when those companies that had been invited (none of which was Apex) submitted their bids. Whether or not Populous actually used Apex's pricing model is irrelevant, because the NFL had already terminated its relationship with Apex by not inviting Apex to submit a bid. Accordingly, Apex's assertion that Populous' use of Apex's pricing model caused damage to its relationship with the NFL is incorrect as a matter of law. See PCO, Inc., 150 Cal. App. 4th at 395.

The same is true for the NCAA Men's and Women's Final Four contracts. Dave Worlock, the man in charge of awarding the Final Four credentialing contracts, decided on February 6, 2008, that he would engage Johnson's services for that year's Men's and Women's Final Four Tournaments despite not knowing how much it would cost. Pop. SUF ¶¶ 43, 44. Because Johnson (and Dahl) had been the contacts for previous Final Four credentialing while at Apex, Worlock determined to use her services regardless of which company she worked for. Id. ¶ 42. Johnson (on behalf of Populous) did not submit a pricing bid for the contracts until February 15, 2008, nine days after Worlock had awarded her the contracts. Id. ¶ 47. Thus, it cannot be said that the NCAA determined not to use Apex because of Johnson's (and Populous') use of Apex's prices.[11] Accordingly, plaintiffs' conversion claim against Populous for use of its pricing models in bidding on the NCAA Final Four contracts must fail. See PCO, Inc., 150 Cal. App. 4th

---

[10]Whether or not Zumwalt made such a request, or whether Dahl lied to Supovitz in an effort to undermine Zumwalt, is in dispute. That question bears on Dahl's alleged interference with economic advantage and is discussed therein.

[11]Although Apex contends that the timing of Johnson's departure from Apex was another factor in the NCAA's decision, timing is not independently wrongful and Apex does not own it, and therefore "timing" cannot form the basis for a conversion claim. See PCO, Inc., 150 Cal. App. 4th at 395.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-9273 CAS (RCx) | Date | November 15, 2011 |
|---|---|---|---|
| Title | EXECUTIVE SECURITY MANAGEMENT, INC., ET AL. v. JACK DAHL, ET AL. | | |

at 395. (requiring causal connection between conversion and alleged damage).

In accordance with the foregoing, the Court GRANTS Populous' motion for summary judgment as to Apex's second claim.

### C.     Third Claim: Intentional Interference With Contract Against Dahl and Johnson

To establish a claim for intentional interference with contract, a plaintiff must prove: (1) a valid contract between plaintiff and a third party; (2) a defendant's knowledge of the contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contract; (4) actual breach or disruption as a result of the acts; and (5) damages to plaintiff resulting from the breach.  Pac. Gas & Elec. Co. v. Bear Stearns & Co., 50 Cal. 3d 1118, 1126 (1990); Quelimane Co. v. Steward Tit. Guar. Co., 19 Cal. 4th 26, 55 (1998).

Although plaintiffs plead interference with its alleged PGA Tour and NFL contracts, see SAC ¶¶ 65, 66, 74, plaintiffs have since dismissed this claim with respect to contracts with all third parties except for Apex's contracts with LJRFP, LLC and The Yucaipa Companies (collectively, "Yucaipa").  Plaintiffs aver that Dahl interfered with the Yucaipa contracts by making disparaging remarks to Yucaipa's Frank Renzi about Zumwalt, Apex, and CSC.  See Declaration of J. Bradley Leitch ("Leitch Decl.", ¶ 24, Exh. W (plaintiffs' response to interrogatories).

Johnson moves for summary judgment on the ground that Renzi did not make the decision to terminate the contracts—Yucaipa's owner Ron Burkle did.  J. Mot. at 11. Johnson maintains that Renzi never conveyed any of Dahl's alleged statements to Burkle, but that Burkle terminated the contract "due to various incidents culminating in one Apex employee claiming that another Apex employee pulled a knife on him."  Id.

Apex responds that there is a triable issue as to whether the contract would have been performed but-for Dahl's wrongful conduct.  Pl. Opp'n 1 at 11–12 (citing Dryden v. Tri-Valley Growers, 65 Cal. App. 3d 990, 997 (Cal. Ct. App. 1977)).  Specifically, Apex contends that paragraph 4 to the Apex-Yucaipa agreement provides that "for one year after termination of the contract, [Yucaipa] shall not solicit, offer to hire, or hire any

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-9273 CAS (RCx) | Date | November 15, 2011 |
|---|---|---|---|
| Title | EXECUTIVE SECURITY MANAGEMENT, INC., ET AL. v. JACK DAHL, ET AL. | | |

former Apex employees to perform security services, and that in the event Yucaipa solicits, offers to hire, or hires any former Apex employees, Yucaipa must "pay Apex a fee equal to 20% of the employees' expected first year earnings or $5,000, whichever is greater." Pl. Opp'n at 12. According to Apex, Renzi was aware of the penalty provisions of the contracts and asked Dahl for authorization to keep certain Apex employees working as security for Yucaipa after Apex's contract was terminated. Id. "Dahl told Renzi that he confirmed with Damon Zumwalt" that Yucaipa could continue to use Apex employees "and there would be no penalty/fee provision enforced." Id. According to Apex, however, "Dahl lied" to Renzi about Zumwalt's acquiescence because Zumwalt "would not have waived the penalty fee," which allegedly amounts to $75,581. Id. at 13. Thus, Apex asserts that Dahl's lies to Renzi interfered with Apex's contract with Yucaipa and caused Apex to lose $75,851. Id.

Johnson replies that Apex's speculative arguments fail to present a triable issue of material fact. J. Reply at 9–11. Specifically, Johnson contends Apex's argument is nothing more than "rank speculation and conjecture":

> Apex argues that Yucaipa's security manager, Frank Renzi, wanted possibly to continue using certain unidentified Apex guards even after giving notice of termination of the contracts, that Renzi contacted Dahl to see if Apex would waive the contractual provision under which Yucaipa could be liable for hiring Apex's guards, and that Dahl agreed. . . . Apex now contends . . . that if Dahl had not agreed to waive the penalty provision, Mr. Burkle might have changed his mind about terminating the contracts so Yucaipa could continue using these unidentified guards that Burkle had just ordered Renzi to fire.

Id. at 9.

Moreover, Johnson argues that even if Dahl told Renzi Apex would waive the penalty fee, he was authorized to make that decision and his actions are protected under the business judgment rule. Id. at 11–12.

First, the Court finds that Dahl and Johnson's alleged disparaging remarks to Renzi about Zumwalt did not interfere with the Apex-Yucaipa contracts as a matter of law. First, and most importantly, Renzi unequivocally testified that he does not recall ever

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-9273 CAS (RCx) | Date | November 15, 2011 |
|---|---|---|---|
| Title | EXECUTIVE SECURITY MANAGEMENT, INC., ET AL. v. JACK DAHL, ET AL. | | |

hearing Dahl or Johnson make any disparaging remarks about Apex, CSC, or Zumwalt at any time, and therefore never related any such statements to Burkle or anyone else. Leitch Decl., Exh. H (Renzi deposition) at 85–87.  Moreover, Renzi testified that it is irrelevant whether Dahl made such statements because Burkle is the sole decisionmaker regarding the Apex contracts and he decided to terminate the contracts because one Apex employee allegedly attacked another Apex employee with a knife—facts that plaintiffs do not dispute.  Johnson Statement of Uncontroverted Facts ("J. SUF") ¶¶ 94–98; see Supp. Leitch Decl., ¶ 11, Exh. J (Renzi deposition) at 36 (explaining that Burkle had the final authority regarding terminating any Yucaipa contracts: "When Burkle said 'Terminate,' we terminate.  It's as simple as that").  In light of this uncontroverted testimony, a rational jury could not find that Dahl's alleged statements to Renzi caused any interference with the Apex-Yucaipa contracts because Burkle did not know of the statements and decided to terminate the contracts for entirely different reasons.  See Celotex, 477 U.S. at 324.

Second, Apex has not offered any evidence that Dahl's alleged promise to waive the paragraph 4 penalty fee somehow interfered with the Yucaipa contracts.  Apex has failed to identify a single employee Renzi wished to retain, whether Renzi could have convinced Burkle to retain that employee, or whether such employee was in fact retained. See Federal Trade Comm'n v. Stefanchik, 559 F.3d 924, 929 (9th Cir. 2009) ("A non-movant's bald assertions or a mere scintilla of evidence in [its] favor are both insufficient to withstand summary judgment.").[12]  Apex has simply offered no evidence that Dahl's alleged waiving of the penalty fee interfered with the Apex-Yucaipa contracts in any way.

Accordingly, Johnson's motion for summary judgment is GRANTED as to the

---

[12]Moreover, at that point Burkle had decided to terminate the Apex contracts, and thus it is unclear whether there remained a valid contract with which to interfere.  Pac. Gas, 50 Cal. 3d at 1126 (requiring the existence of a valid contract to maintain an interference with contract claim); Richman Decl., Exh. 17(c) (Renzi deposition) at 69 (describing conversation with Dahl in which Dahl asked Renzi whether there was anything he (Dahl) could do to save the contract, and Renzi responding: "No, once [Burkle's] made up his mind.  We can revisit it in a year").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-9273 CAS (RCx) | Date | November 15, 2011 |
|---|---|---|---|
| Title | EXECUTIVE SECURITY MANAGEMENT, INC., ET AL. v. JACK DAHL, ET AL. | | |

third claim.

### D. Fourth Claim: Intentional Interference With Prospective Economic Advantage Against Dahl and Johnson

To maintain a claim for intentional interference with prospective economic advantage, a plaintiff must prove: (1) an economic relationship between the plaintiff and a third party having the probability of future economic benefit to plaintiff; (2) knowledge by the defendant of the existence of the relationship; (3) an intentional, independently wrongful act on the part of the defendant to disrupt the relationship; (4) actual disruption of the relationship; and (5) damages caused by defendant's wrongful act. Blank v. Kirwan, 39 Cal. 3d 311, 330 (1985).

Plaintiffs allege that Dahl and Johnson interfered with their prospective economic benefits with the NFL, the PGA Tour, the NCAA Final Four, and Yucaipa.[13] SAC ¶¶ 80–81. Each entity will be discussed in turn.

#### 1. The NFL

Plaintiffs allege that Dahl interfered with Apex's economic relationship with the NFL by refusing to follow Zumwalt's instructions leading up to the 2008 Super Bowl. Pl. Opp'n 1 at 7. Specifically, plaintiffs allege that Dahl "lied to Frank Supovitz, Senior VP Events for the NFL, by telling Mr. Supovitz that Damon Zumwalt wanted an all-access credentialing, i.e., an all-access pass." Id. According to plaintiffs, however, Zumwalt never asked Dahl to obtain an all-access credential because Zumwalt did not intend to stay at the credentialing center, and Supovitz, "not knowing this was a lie," believed Zumwalt was not entitled to an all-access credential and was "offended by the

---

[13]Apex also contends that defendants interfered with their prospective economic benefits against NCAA Bowl Games, "Other Credentialing, Adventous, Other Apex Divisions, Increased Labor Costs, and Extra Equipment Costs." However, nowhere in the complaint or in any of the papers does Apex delineate what these other credentialing services might be. Accordingly, the Court will address only the four entities in direct dispute.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-9273 CAS (RCx) | Date | November 15, 2011 |
|----------|----------------------|------|-------------------|
| Title | EXECUTIVE SECURITY MANAGEMENT, INC., ET AL. v. JACK DAHL, ET AL. | | |

request." Id. at 7–8. Plaintiffs conclude that Supovitz thereafter refused to permit Apex to bid on the 2009 Super Bowl because he thought Zumwalt's "request" for an all-access pass was inappropriate. Pop. SUF ¶ 14 (undisputed). Supovitz made clear that Apex *would* have been invited to bid on the 2009 Super Bowl—even without Dahl and Johnson working for Apex—but-for the "all-access" credential incident involving Zumwalt. See Richman Decl., Exh. 12(a) (Supovitz Deposition) at 165.

The Court finds that although it is uncertain whether Apex would have secured the 2009 Super Bowl contract had it been invited to bid, there is a question of fact as to whether Dahl's alleged actions (or inaction) prevented Apex from bidding, and thereby interfered with Apex's potential future economic relationship with the NFL in light of the fact that Apex had provided credentialing services for the previous six Super Bowls (2003–2008).[14] See Kirwan, 39 Cal. 3d at 330 (requiring actual disruption of an economic relationship and resulting damages); Plaintiffs' Statement of Uncontroverted Facts ("Pl. SUF") ¶ 7. Although Johnson contends that Apex could not have secured the 2009 Super Bowl contract without the services of Dahl and Johnson, that question is better left for the jury, especially in light of Supovitz's clarification that he would have invited Apex to bid on the 2009 Super Bowl contract but-for the "all-access" credential incident involving Zumwalt. See Richman Decl., Exh. 12(a) (Supovitz Deposition) at 165; Zenith Radio Corp., 475 U.S. at 587 ("[T]he inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."). Accordingly, Johnson is not entitled to summary judgment for this claim on this basis.

## 2. The PGA Tour

For the same reasons discussed regarding plaintiffs' conversion claim, supra Section IV-B, Dahl and Johnson's alleged destruction of Apex's printers and deletion of Apex's PGA data could equally support plaintiffs' intentional interference with

---

[14]It is undisputed that at the time these incidents took place, Apex had an economic relationship with the NFL and that Dahl and Johnson knew of it.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-9273 CAS (RCx) | Date | November 15, 2011 |
|----------|----------------------|------|-------------------|
| Title | EXECUTIVE SECURITY MANAGEMENT, INC., ET AL. v. JACK DAHL, ET AL. | | |

prospective economic advantage claim.[15]  The PGA's Ray-Crist testified that her decision not to retain Apex was because of Apex's "failure to perform" the printing contract in a timely fashion.  Richman Decl., Exh. 9(d) (deposition of Vicki Ray-Crist) at 99 ("I don't know what they did.  They just couldn't get the badges printed that we needed and it caused an embarrassment to the PGA of America.").  Again, whether these allegedly wrongful acts caused actual disruption of the Apex-PGA relationship and the resulting damages (of not receiving future PGA contracts) is a question for the jury.  Kirwan, 39 Cal. 3d at 330; Zenith Radio Corp., 475 U.S. at 587.

### 3.    The NCAA Men's and Women's Final Four

Apex contends that "up until the time Johnson left Apex, the NCAA intended to use Apex for the 2008 Men's and Women's Final Four basketball championships."  Pl. Opp'n 1 at 16.  Apex argues that Johnson interfered with Apex's future expectation of economic benefits by converting Apex's 2007 pricing models and "stealing away" the contract for Populous.  Id.  Apex also asserts that the "timing" of Johnson leaving Apex was a factor in the NCAA awarding Populous the 2008 Final Four contracts.  Id.

In contrast to plaintiffs' claims regarding the PGA and NFL discussed above, Apex has presented no evidence of any "intentional, independently wrongful act on the part of the defendant to disrupt the relationship" between Apex and the NCAA.  Kirwan, 39 Cal. 3d at 330.  Instead, Apex simply argues that the timing of Johnson's departure and Populous' alleged use of Apex's pricing model means Dahl and Johnson improperly interfered with Apex's future economic expectations as to the NCAA.  These actions, however, are not independently wrongful.  Plaintiffs have not presented any evidence to the contrary, and thus mere arguments cannot withstand summary judgment.  Stefanchik, 559 F.3d at 929 ("A non-movant's bald assertions or a mere scintilla of evidence in [its] favor are both insufficient to withstand summary judgment.").

### 4.    Yucaipa Contracts

---

[15]It is undisputed that at the time these incidents took place, Apex had an economic relationship with the PGA Tour and that Dahl and Johnson knew of it.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-9273 CAS (RCx) | Date | November 15, 2011 |
|----------|----------------------|------|-------------------|
| Title | EXECUTIVE SECURITY MANAGEMENT, INC., ET AL. v. JACK DAHL, ET AL. | | |

Apex sets forth the same arguments to support intentional interference with economic advantage regarding its Yucaipa contracts as it did with respect to its third claim for interference with contract. As discussed <u>infra</u>, however, plaintiffs are not entitled to move forward on that claim because the evidence unequivocally establishes that Burkle terminated Apex's contracts because one Apex employee allegedly attacked another Apex employee with a knife—facts that plaintiffs do not dispute. J. SUF ¶¶ 94–98. That incident did not involve Dahl or Johnson and cannot form the basis for liability. <u>See</u> <u>Celotex</u>, 477 U.S. at 324. Moreover, as set forth more fully above, the contention that Dahl's alleged promise to Renzi to waive the paragraph 4 penalty fee caused interference with Apex's prospective economic expectation with Yucaipa simply is not supported by any evidence. <u>See</u> <u>Federal Trade Comm'n v. Stefanchik</u>, 559 F.3d 924, 929 (9th Cir. 2009) ("A non-movant's bald assertions or a mere scintilla of evidence in [its] favor are both insufficient to withstand summary judgment.").

In sum, Johnson's motion for summary judgment as to the fourth claim is GRANTED in part and DENIED in part. It is granted insofar as plaintiffs' claims arise out of their expectation of economic benefit with the NCAA or Yucaipa. It is denied to the extent plaintiffs' claims are based on their economic expectations with the NFL and the PGA Tour.

### E.    Fifth Claim: Intentional Interference With Prospective Economic Advantage Against Populous

As an initial matter, the parties dispute whether or not Johnson and Dahl had written employment contracts containing covenants not to compete. <u>Compare</u> Pl. SUF ¶ 109 <u>with</u> Pop. SUF ¶ 2. Plaintiffs offer the testimony of CSC Vice President Granger in an attempt to establish that Dahl and Johnson had contracts containing non-compete clauses. However, Granger merely testified that he "believes" Dahl and Johnson had written employment contracts that contained non-compete clauses. <u>See</u> Supp. Leitch Decl., Exh. D (Granger deposition) at 86–87. Asked why plaintiffs have been unable to produce any documentation of any employment contracts, Granger stated that his best "guess" is that "[Johnson] or [Dahl] went into [Zumwalt's] office and took it out of the file." <u>Id.</u> at 139. Granger's speculative testimony is insufficient to establish that Dahl or Johnson's contracts contained covenants not to compete, and plaintiffs have offered no other evidence in support of their position. <u>Stefanchik</u>, 559 F.3d at 929 ("A non-

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-9273 CAS (RCx) | Date | November 15, 2011 |
|---|---|---|---|
| Title | EXECUTIVE SECURITY MANAGEMENT, INC., ET AL. v. JACK DAHL, ET AL. | | |

movant's bald assertions or a mere scintilla of evidence in [its] favor are both insufficient to withstand summary judgment."). Accordingly, the Court cannot find that Dahl or Johnson were bound by non-compete clauses, and the mere fact that plaintiffs left Apex and CSC to work for Populous does not subject Populous to liability.

As to their fifth claim, plaintiffs do not allege that Populous committed any independently wrongful acts to interfere with plaintiffs' prospective economic relationships aside from Populous' alleged conversion of plaintiffs' confidential information, discussed supra. Rather, plaintiffs rely on an agency theory for Populous' liability. Thus, in order to maintain their fifth claim against Populous based on Dahl and Johnson's actions prior to their resignations from Apex and CSC, plaintiffs must establish that Dahl's or Johnson's actions may be imputed to Populous, either through an agency relationship or through Populous' ratification. In California, an agency relationship "arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Huong Que, Inc. v. Luu, 150 Cal. App. 4th 400, 410–11 (Cal. Ct. App. 2007). Once an agency relationship is established, the principal can be held liable for the acts of its agent. Von Beltz v. Stuntman, Inc., 207 Cal. App. 3d 1467, 1488 (Cal Ct. App. 1989). A principal can be liable for its agent's acts if it acquiesces to those acts, even if the agent is not the principal's employee. Lux Art Van Serv. v. Pollard, 344 F.2d 833, 888 (9th Cir. 1965).

Here, plaintiffs contend that three different incidents establish that Dahl and/or Johnson had become agents of Populous prior to Dahl resigning from Apex on February 11, 2008, and Johnson resigning from CSC on February 4, 2008. First, plaintiffs allege a "secret meeting" between Dahl and Johnson and Populous principal Jerry Anderson on or around January 15–17, 2008; second, Johnson allegedly contacted the PGA on February 3 or 4, 2008, advising the PGA she and Dahl were affiliated with Populous; finally, plaintiffs allege that Johnson contacted the NCAA on February 5, 2008, in an attempt to secure the 2008 Men's and Women's Final Four credentialing work for Populous. Pl. Opp'n to Pop. Mot. at 3–4, 8, 10.

Populous responds that Apex has failed to produce any evidence of an agency relationship for Johnson before February 15, 2008 (when Johnson joined Populous) or for Dahl before March 13, 2008 (when Dahl joined Populous). See Populous Mot. for

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-9273 CAS (RCx) | Date | November 15, 2011 |
|----------|----------------------|------|-------------------|
| Title | EXECUTIVE SECURITY MANAGEMENT, INC., ET AL. v. JACK DAHL, ET AL. | | |

Summary Judgment ("Pop. Mot.") at 3–4.  Moreover, Populous contends that its actions did not ratify Dahl and Johnson's acts.  Pop. Reply at 5.

Each purported basis for imputing Dahl and/or Johnson's actions to Populous is discussed in turn.

> 1.      **"Secret Meeting" Between Dahl, Johnson, and Populous Principal Jerry Anderson Resulting in Alleged Interference With Apex's Economic Expectancy as to the NFL**

According to plaintiffs, on or about January 15–17, 2008, while still employed by Apex and CSC, Dahl and Johnson approached Populous principal Jerry Anderson and asked for a "secret meeting."  Richman Decl., Exh. 8(a) (deposition of Jerry Anderson)).  At that meeting, Dahl and Johnson allegedly disparaged Apex CEO Zumwalt and told Anderson they were leaving Apex and CSC and were interested in joining Populous.  Id.  Apex thus contends that Dahl and Johnson's subsequent wrongful acts were done as agents for Populous.  Id.

Populous contends that Anderson's testimony "absolutely negates any claim" that an agency relationship resulted from the January, 2008 meeting.  Pop. Reply at 4.  Populous argues that plaintiffs' "bald assertions" of an agency relationship do not create triable issues of fact.  Id.

The Court finds that the Anderson testimony, upon which plaintiffs rely, does not establish a triable issue of material fact as to whether Anderson's January 2008 meeting with Dahl and Johnson gave rise to an agency relationship with Populous.  Anderson testified that Dahl and Johnson approached him to discuss their unhappiness with how Zumwalt was treating them as they each battled cancer.  See Richman Decl., Exh. 8(a) at 78–82.  According to Anderson, Dahl and Johnson "were weighing their options for the future" and told Anderson "they would like to hold conversations if we [Populous] were interested in holding conversations."  Id. at 82.  Anderson, however, quickly disposed of Dahl and Johnson's desire to discuss employment with Populous:

> I was very quick to point out to them, we're [Populous] not going to hold conversations.  I'm not going to talk about this.  You're employees of another

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-9273 CAS (RCx) | Date | November 15, 2011 |
|---|---|---|---|
| Title | EXECUTIVE SECURITY MANAGEMENT, INC., ET AL. v. JACK DAHL, ET AL. | | |

company. At some point will I consider it? Yeah. But I have to go to a board. I have to think about all those things . . . I said that to them directly. I said, you know, at some point in the future if you are not employed, then perhaps we can talk about this. But I made sure that there was quite a clean—clean exit.

Id. at 82–83.

Anderson's testimony does not establish a triable issue of fact as to whether that conversation alone—which lasted only 15 minutes (id. at 76)—established an agency relationship between Dahl and/or Johnson and Populous. Anderson's testimony establishes that Populous affirmatively did *not* want to enter into any relationship with Dahl and Johnson while they were employed by Apex and CSC. Apex has offered absolutely no other evidence, circumstantial or otherwise, to support its claim that an agency relationship arose from the conversation alone; accordingly, Apex's evidence in support of its agency theory is insufficient to withstand summary judgment. Stefanchik, 559 F.3d at 929 ("A non-movant's bald assertions or a mere scintilla of evidence in [its] favor are both insufficient to withstand summary judgment."). Any wrongful acts allegedly committed by Dahl or Johnson following the January meeting prior to their departure from Apex's employ—such as Dahl allegedly lying to the NFL's Frank Supovitz regarding Zumwalt's supposed request for an all-access credential to the 2008 Super Bowl—cannot be imputed to Populous on this basis, and Populous cannot be held liable for intentional interference relating to those actions.

### 2. Johnson's Phone Call to the PGA on February 3 or 4, 2008

Apex contends that on February 3 or 4, 2008, Johnson called the PGA Tour contact person Vicki Ray-Crist and told her that Zumwalt had fired her and suspended Dahl but that Ray-Crist should not worry because they had already found a new accrediting company, Populous. Pl. SUF ¶ 128. Apex argues that Populous should be liable for Johnson's allegedly improper solicitation because Dahl and Johnson were working on behalf of Populous while Dahl still worked for Apex. See id. Apex further asserts that on February 20, 2008, Johnson wrote to the PGA in an attempt to bring the PGA credentialing work to Populous by disparaging Apex's ability to perform the work. Id. Apex contends that "a triable issue of fact exists as to whether Dahl and Johnson acted as agents of Populous when they took action to interfere with APEX's long-standing

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-9273 CAS (RCx) | Date | November 15, 2011 |
|---|---|---|---|
| Title | EXECUTIVE SECURITY MANAGEMENT, INC., ET AL. v. JACK DAHL, ET AL. | | |

relationship with the PGA."  Pl. Opp'n 2 at 10.

Populous counters that "Apex leaves out Ray-Crist's testimony in which she made absolutely clear" that Johnson did not mention Populous during the phone call, but only in the February 20, 2008 letter, well after Johnson had left CSC and begun working for Populous.  Pop. Reply at 5.

The Court finds that Populous is entitled to summary judgment as to Populous' alleged interference with Apex's economic expectancy with the PGA.  Importantly, the PGA Tour did *not* retain Populous's services following Johnson's phone call to Ray-Crist.  Instead, the PGA Tour retained Apex to do credentialing work for the 2008 PGA Championship and Ryder Cup matches in March, 2008.  Pop. SUF ¶¶ 81–82.  It cannot be said that Johnson's phone call with Ray-Crist interfered with Apex's economic expectancy with the PGA when the PGA thereafter retained and paid for Apex's services. Kirwan, 39 Cal. 3d at 330.[16]

Accordingly, Populous' motion for summary judgment is GRANTED as to the fifth claim insofar as it alleges interference with Apex's economic expectancy with the PGA Tour.

### 3.    Johnson's Contact With the NCAA on February 5 and 6, 2008

Plaintiffs allege that on February 5, 2008, Johnson notified Rick Nixon of the

---

[16]Moreover, Populous cannot be subject to liability for Johnson and Dahl's alleged wrongful conduct of deleting files off their laptops and harming Apex's printers even had Johnson mentioned Populous in the phone call with Ray-Crist.  Plaintiffs have offered absolutely no evidence that those actions were done on behalf of Populous or with Populous' knowledge.  There also is no evidence of Populous' ratification because Apex has offered no evidence that Dahl and Johnson held themselves out to be agents of Populous.  See Rood v. Cnty of Santa Clara, 113 Cal. App. 4th 549, 572 (Cal. Ct. App. 2003) (holding that "ratification is possible only when the person whose unauthorized act is to be accepted purported to act as an agent for the ratifying party") (internal quotation marks and citation omitted).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-9273 CAS (RCx) | Date | November 15, 2011 |
|---|---|---|---|
| Title | EXECUTIVE SECURITY MANAGEMENT, INC., ET AL. v. JACK DAHL, ET AL. | | |

NCAA that she had left Apex and wanted to take the NCAA Men's and Women's Final Four credentialing work with her. Pl. SUF ¶ 120. On February 6, 2011, plaintiffs allege that Johnson sent an email to Dave Worlock of the NCAA restating her and Dahl's intentions. Id. As with the PGA, Apex appears to argue that Populous should be liable for Johnson's improper solicitation because Johnson and Dahl were working together on behalf of Populous while Dahl was still employed by Apex. According to plaintiffs, "up to the time Dahl and Johnson left, the NCAA intended to use Apex for the 2008 Men's and Women's Final Four championships." Id. Plaintiffs allege that Johnson, "as agent for and on behalf of Populous," used Apex's 2007 pricing model to "steal away" the 2008 Final Four credentialing services. Id. ¶ 123; Pl. Opp'n to Pop. Mot. at 11.

Populous responds that Johnson did not mention Populous to the NCAA until after she began working for Populous and after Dahl had quit from Apex. Pop. Reply at 5. Moreover, Populous asserts that "the NCAA's Nixon testified Johnson did not mention Populous until sometime within the next few weeks" of the February 6, 2008 email. Id.

As discussed supra, Section IV-D-3, Apex has presented no evidence of any "intentional, independently wrongful act" on the part of Dahl or Johnson that interfered with Apex's economic expectancy with the NCAA. Accordingly, even had Johnson been acting as Populous' agent while corresponding with Nixon, she committed no independently wrongful act as required to prove this claim. Kirwan, 39 Cal. 3d at 330. Thus, the Court GRANTS Populous' motion for summary judgment as to the fifth claim as to Populous' alleged interference with Apex's economic expectancy with the NCAA.

In accordance with the foregoing, Populous' motion for summary judgment is GRANTED as to plaintiffs' fifth claim. Plaintiffs have not offered any evidence establishing that Dahl and Johnson were working as Populous' agents, implied or otherwise, while working for Apex. Moreover, Johnson's conversation with the PGA Tour's Ray-Crist following her resignation from Apex did not interfere with Apex's economic expectancy because the PGA Tour subsequently awarded Apex—and not Populous—credentialing contracts. Finally, Johnson's communications with the NCAA's Nixon was not an independently wrongful act as required to prove interference with economic expectancy.

**F.      Sixth Claim for Violations of the Computer Fraud and Abuse Act**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-9273 CAS (RCx) | Date | November 15, 2011 |
|---|---|---|---|
| Title | EXECUTIVE SECURITY MANAGEMENT, INC., ET AL. v. JACK DAHL, ET AL. | | |

**Against Dahl and Johnson**

"The CFAA prohibits a number of different computer crimes, the majority of which involve accessing computers without authorization or in excess of authorization, and then taking specified forbidden actions, ranging from obtaining information to damaging a computer or computer data." <u>LVRC Holdings LLC v. Brekka</u>, 581 F.3d 1127, 1131 (9th Cir. 2009) (citing 18 U.S.C. § 1030(a)(1)–(7)).[17]  For example, liability may be warranted for a defendant who:

> (4) knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value. . . .

> (5)(A) knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer.

18 U.S.C. §§ 1030(a)(4), 1030(a)(5)(A).

The statute also makes clear that in the context of these types of claims, plaintiffs must also prove that they incurred a loss of more than $5,000 as a result of defendants' conduct.  <u>See</u> 18 U.S.C. § 1030(c)(4)(A)(i)(I).

In this case, plaintiffs aver that Dahl and Johnson exceeded their authorized access to Apex's computers in violation of the CFAA.  SAC ¶ 103.  Specifically, Apex alleges that Dahl and Johnson knowingly used an "erasure program" to delete Apex's data without authorization.  <u>Id.</u> ¶¶ 105, 107.

---

[17]Although the CFAA is primarily a criminal statute, subsection (g) authorizes a private civil action so long as the conduct involves one of the factors set forth in subsection (c)(4)(A)(i).  Defendants erroneously rely on provisions and citations from the 1986 version of the CFAA; in fact, the CFAA was amended and became effective in 2008, prior to the filing of this lawsuit.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-9273 CAS (RCx) | Date | November 15, 2011 |
|----------|----------------------|------|--------------------|
| Title | EXECUTIVE SECURITY MANAGEMENT, INC., ET AL. v. JACK DAHL, ET AL. | | |

Johnson moves for summary judgment on the ground that plaintiffs have refused to produce any documents demonstrating a loss of more than $5,000. J. Mot. at 14–15. Johnson contends that "[b]ecause plaintiffs have refused to produce evidence in discovery on this point, they would be precluded from introducing it at trial." Id. at 15. Moreover, Johnson argues that plaintiffs cannot establish who specifically committed the wrongful acts, because the SAC alleges that Dahl and Johnson committed acts collectively. Id. According to Johnson, "plaintiffs must do more than make allegations; they must present evidence of which defendant committed what act that violated the CFAA." Id.

Apex responds that because "loss" under the CFAA is explicitly defined in terms of "economic damages," any loss of business and business goodwill constitutes recoverable damages under the CFAA. Pl. Opp'n 1 at 18 (citing Creative Comp. v. Getloaded.com LLC, 386 F.3d 930, 935 (9th Cir. 2004)). Apex contends that Dahl and Johnson violated the substance of the statute by exceeding their authorized access to their computers and Apex's computer network. Pl. Opp'n 1 at 19. Specifically, "there is evidence that Dahl and Johnson violated the CFAA by wiping their laptops clean, destroying all documentation they had accumulated on behalf of and for the benefit of Apex and further, tampering and altering information in the Apex computers." Id. Apex asserts that these erasures caused the PGA to terminate its relationship with Apex, causing it to lose "in excess of $118,000." Id. at 19–20.

Johnson replies that of the six computers Dahl and Johnson allegedly "wiped clean," only Dahl and Johnson's personal computers "transmitt[ed] a program" as required by § 1030(a)5(A). J. Reply at 16. Therefore, according to Johnson, "whatever allegedly was done to the four Apex laptops other than the Dahl and Johnson laptops is not relevant" to Apex's CFAA claim. Id. Moreover, Johnson argues that "Apex has not provided any evidence that Dahl's or Johnson's laptop contained any information needed for the PGA project." Id. Johnson asserts that according to Apex, the damaged printers, and not any lost data, caused Apex's delays in providing the PGA with its credentialing services during the 2008 Ryder Cup which is the reason the PGA discontinued its relationship with Apex. Id. at 18.

The Court finds that Apex has adequately demonstrated a triable issue of fact to withstand summary judgment on its CFAA claim to the extent it arises under

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 09-9273 CAS (RCx) | Date | November 15, 2011 |
|---|---|---|---|
| Title | EXECUTIVE SECURITY MANAGEMENT, INC., ET AL. v. JACK DAHL, ET AL. | | |

§ 1030(a)(4).[18]  Specifically, plaintiffs have raised a triable issue of material fact as to whether Dahl and Johnson "exceed[ed their] authorized access" by destroying evidence on their own personal laptops and Apex's computers.  18 U.S.C. § 1030(a)(4).  Pl. SUF ¶¶ 153, 154.  There is also a triable issue as to damages.  As discussed in the context of Apex's second claim for conversion, whether deletion of this data caused the PGA to discontinue its relationship with Apex—and thus causing it financial harm—is properly a question for the jury.  See supra, Section IV-B-1; Creative Comp., 386 F.3d at 935 (holding that  "economic damages" under the CFAA include any loss of business and business goodwill and are recoverable).

Accordingly, Johnson's motion for summary judgment is DENIED as to plaintiffs' sixth claim.

### G.    Seventh Claim for Violation of the Wiretap Act Against Dahl and Johnson

To establish a claim under the Wiretap Act, a plaintiff must prove that a defendant "intentionally intercept[ed], endeavor[ed] to intercept, or procure[d] any other person to intercept or endeavor to intercept any wire, oral, or electronic communication."  18 U.S.C. § 2511(1)(a).

Plaintiffs aver that Dahl and Johnson "intercepted, caused to be intercepted, or induced some other person to intercept" confidential emails in excess of their authorized access.  SAC ¶ 114.

Johnson moves for summary judgment because the acts plaintiffs allege "do not violate the Wiretap Act."  J. Mot. at 16.  Specifically, Johnson argues that "forwarding

---

[18]Although the SAC asserts only violations of § 1030(a)(5)(A)(i) specifically, the entire claim is brought under § 1030 generally, and thus plaintiffs are permitted to pursue any claims thereunder.  See SAC ¶ 103.  See Theofel v. Farey-Jones, 359 F.3d 1066, 1077 n.4 (9th Cir. 2004) (noting that complaints are to be construed liberally and courts must look at their substance rather than form) (citing Lynn v. Sheet Metal Workers' Int'l Ass'n, 804 F.2d 1472, 1482 (9th Cir. 1986)).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-9273 CAS (RCx) | Date | November 15, 2011 |
|---|---|---|---|
| Title | EXECUTIVE SECURITY MANAGEMENT, INC., ET AL. v. JACK DAHL, ET AL. | | |

copies of email or causing copies to be forwarded is not an 'interception' as required to establish a violation." Id. (citing Bunnell v. Mot. Picture Ass'n of Am., 567 F. Supp. 2d 1148 (C.D. Cal. 2007)). Even if forwarding emails constituted an interception, Johnson argues that Apex cannot prevail because it has not produced any copies of any emails. J. Mot. at 17.

Apex responds that Dahl admitted to CSC VP Granger that he had been reading emails he was not authorized to access, and that other Apex employees saw that Dahl's cell phone contained those unauthorized emails. Pl. Opp'n 1 at 20–21. Apex maintains that these facts are "sufficient to raise" a genuine issue of material fact. Id. at 21.

The Court finds that Apex cannot prove this claim as a matter of law. In Bunnell, the court specifically rejected the plaintiffs' email-forwarding theory under the Wiretap Act and granted summary judgment for defendants. The court noted that the defendant "did not stop or seize any of the messages that were forwarded to him." 567 F. Supp. 2d at 1154. In other words, the defendant's actions "did not halt the transmission of the messages to their intended recipients. As such, under well-settled case law, as well as a reading of the statute and the ordinary meaning of the word 'intercept,' Anderson's acquisition of the emails did not violate the Wiretap Act." Id. See also Konop v. Hawaii Airlines, Inc., 302 F.3d 868, 878 (9th Cir. 2002) (adopting commonsense definition of "intercept" to Wiretap Act).

Here, like Bunnell, Apex has alleged only that Johnson and Dahl "have configured email settings such that copies of emails not intended for their eyes were sent to their email accounts." Leitch Decl. ¶ 26, Exh. Y (plaintiffs' responses to interrogatories); see also id. ¶ 29, Exh. BB (plaintiffs' chief information officer Abraham Kumar deposition) at 245 ("The only way Mr. Dahl could have gotten the copy of the E-mail was because Mr. Dahl was the administrator . . . he had to have forwarded [the] E-mails to himself."). The only other evidence Apex offers to support its claim is that Dahl told other Apex and CSC employees that he had been reading emails not intended for him, and that other third parties saw that Dahl had those emails on his cell phone. Pl. Opp'n 1 at 20–21. However, those facts are insufficient to demonstrate an "intercept[ion]" under the narrow reading of the Wiretap Act's use of that word. Bunnell, 567 F. Supp. 2d at 1154.

Accordingly, Johnson's motion for summary judgment is GRANTED as to Apex's

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-9273 CAS (RCx) | Date | November 15, 2011 |
|---|---|---|---|
| Title | EXECUTIVE SECURITY MANAGEMENT, INC., ET AL. v. JACK DAHL, ET AL. | | |

seventh claim.

**H.    Eighth Claim for Violation of the Electronic Communications Privacy Act Against Dahl and Johnson**

In order to prove a claim for violation of the ECPA, a plaintiff must prove that the defendant:

(1) intentionally accesse[d] without authorization a facility through which an electronic communication service is provided; or

(2) intentionally exceed[ed] an authorization to access that facility; and thereby obtain[ed], alter[ed], or prevent[ed] authorized access to a wire or electronic communication while it is in electronic storage in such system shall be punished as provided in subsection (b) of this section.

18 U.S.C. § 2701(a).

An exception to subsection (a) exists "with respect to conduct authorized (1) by the person or entity providing a wire or electronic communications service; [or] (2) by a user of that service with respect to a communication of or intended for that user."  18 U.S.C. § 2701(c)(1), (2); see Therapeutic Research Faculty v. NBTY, Inc., 488 F. Supp. 2d 991, 997 (E.D. Cal. 2007).

Apex alleges that Dahl and Johnson "accessed a facility" through which plaintiffs' electronic communication service is provided and thereby gained access to confidential emails.  SAC ¶ 124.  According to Apex, Dahl and Johnson were not authorized to access the facility.  Id. ¶ 125.

Johnson moves for summary judgment on this claim on the ground that Dahl and Johnson were both administrators of Apex's email accounts.  J. Mot. at 19.  Johnson contends that "not only did Dahl and Johnson have authorization to oversee the email accounts, as the administrators, it was their job to do so."  Id. at 20.  Johnson asserts that such authorization defeats plaintiffs' claim.  J. Mot. at 20.  Furthermore, Johnson argues that Apex cannot prove that Dahl and Johnson accessed a "facility" as required by the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-9273 CAS (RCx) | Date | November 15, 2011 |
|---|---|---|---|
| Title | EXECUTIVE SECURITY MANAGEMENT, INC., ET AL. v. JACK DAHL, ET AL. | | |

statute.  J. Reply at 20.

Apex responds that while Dahl and Johnson might have been authorized to access email accounts, they "were not authorized to delete information from their computers." Pl. Opp'n 1 at 21.  Further, Apex contends that Dahl was not authorized to access emails "not addressed to him."  Id.

The Court finds that Johnson is not entitled to summary judgment on this claim. The Ninth Circuit has clarified that violation of the ECPA is akin to common law trespass, and "[a] defendant is not liable for trespass if the plaintiff authorized his entry." Theofel v. Farey-Jones, 359 F.3d 1066, 1072–73 (9th Cir. 2004).  Permission to access a stored communications facility constitutes valid authorization if it such authorization would defeat a common law trespass claim in an analogous situation.  See id.  However, even with authorization to access the facility, a trespasser who accesses unauthorized *information* constitutes an ECPA violation.  Therapeutic Research, 488 F. Supp. 2d at 997 ("[T]he sort of trespasses to which the [ECPA] applies are those in which the trespasser gains access to information . . . which he is not entitled to see.") (internal quotation marks and citations omitted).

Here, plaintiffs' chief information officer Kumar testified at length that Dahl and Johnson were expressly authorized—and, in fact, required as a part of their jobs—to access and maintain Apex's email systems.  See Leitch Decl., ¶ 29, Exh. BB (transcript of Kumar's deposition) at 247 ("[Dahl and Johnson] were both admin[istrators].  The[y] were the ones who created it, deleted and managed those E-mail accounts."); at 262 ("Q. Did you say that [Dahl] and [Johnson] retained control over the Apex administrative part of the Apex E-mail system?  A. Yes, I did.  Q. Up until the time they left?  A. Yes, they did."); at 245 ("Mr. Dahl was the administrator and he administered all of Apex's E-mails.  He controlled the username [and] passwords.").  Thus, Dahl and Johnson could not be found liable under subsection (a)(1) of the statute.  However, there is a question of material fact as to whether Dahl and Johnson "exceed[ed]" their authorization to access Apex's emails under subsection (a)(2). Apex provides the testimony of several witnesses indicating Dahl possessed emails he had not been authorized to see.  E.g., Richman Decl., Exh. 7(e) at 98 (Granger deposition) ("[Dahl] told me he read the e-mails."); id. Exh. 19(a) (Kumar deposition) at 245 ("The only way Mr. Dahl could have gotten the copy of the E-mail was because Mr. Dahl was the administrator . . . he had to have forwarded

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-9273 CAS (RCx) | Date | November 15, 2011 |
|---|---|---|---|
| Title | EXECUTIVE SECURITY MANAGEMENT, INC., ET AL. v. JACK DAHL, ET AL. | | |

[the] E-mails to himself."); id. Exh. 14(c) (Apex employee Truman deposition) at 73 ("[Dahl] whipped out his cell phone . . . [a]nd he shows me an e-mail between . . . Jim Granger and [Brockway]. And I thought that was odd, how would he have one of their e-mails."); id. Exh. 18(b) (Brockway deposition) at 121–22 (discussing the incident between Dahl and Trueman and how Dahl was not authorized to view the emails). Whether or not obtaining these emails "exceed[ed his] authorization" is properly a question for the jury. 18 U.S.C. § 2701(a)(2).

Notwithstanding the above, to the extent plaintiffs' claim is based on Dahl and Johnson's alleged deletion of laptop computer files, it fails as a matter of law. See Hilderman v. Enea Teksci, Inc., 551 F. Supp. 2d 1183, 1204 (S.D. Cal. 2008) (noting that laptops are not a "facility" within the meaning of the ECPA) (citing Theofel, 359 F.3d at 1077 n.4). Thus, the fact that Dahl and Johnson allegedly deleted files off their laptops does not subject them to liability under the ECPA, and summary judgment is warranted to the extent Apex seeks to hold them liable for those actions.

In accordance with the foregoing, Johnson's motion for summary judgment is GRANTED in part and DENIED in part as to plaintiffs' eighth claim. Specifically, it is granted insofar as it relies on Dahl and Johnson deleting information off their laptops. It is denied as to the question of whether Dahl exceeded his authority in viewing emails not addressed to him.

## I.    Ninth Claim for Unfair Competition Against All Defendants

California's UCL encompasses "anything that can properly be called a business practice and that at the same time is forbidden by law . . . It governs 'anti-competitive business practices' as well as injuries to consumers, and has as a major purpose 'the preservation of fair business competition.'" Cel-Tech Comm'ns, Inc. v. L.A. Cellular Tel. Co., 20 Cal. 4th 163, 180 (1999). A defendant's violation of the UCL permits a plaintiff to recover restitution or other equitable remedies. Pineda v. Bank of Am., N.A., 50 Cal. 4th 1389, 1401 (2010); Kaldenback v. Mut. of Omaha Life Ins. Co., 178 Cal. App. 4th 830, 847 (Cal. Ct. App. 2009).

Because plaintiffs have offered sufficient evidence to raise a question of fact in support of their claims against Dahl and Johnson for, inter alia, intentional interference

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 09-9273 CAS (RCx) | Date | November 15, 2011 |
|---|---|---|---|
| Title | EXECUTIVE SECURITY MANAGEMENT, INC., ET AL. v. JACK DAHL, ET AL. | | |

with prospective economic advantage, plaintiffs' UCL claim may also proceed against those defendants. E.g., Taguinod v. World Savings Bank, FSB, 755 F. Supp. 2d 1064, 1074 (C.D. Cal. 2010) (holding that liability under the UCL is generally derivative of liability for violation of some other law). However, because summary judgment is granted in favor of Populous as to the claims which underlie plaintiffs' UCL claim against Populous, that claim also fails. See id. (explaining that "because there are no remaining causes of action, derivative liability under the UCL would be impossible").

Accordingly, Johnson's motion for summary judgment is DENIED as to plaintiffs' ninth claim. Populous' motion for summary judgment is GRANTED as to plaintiffs' ninth claim.

### J.    Tenth Claim for Successor Liability Against Johnson

Johnson's only basis for denying successor liability is because plaintiffs "cannot establish any liability of Dahl" on any of its claims. J. Mot. at 23. However, as discussed infra, plaintiffs have adequately alleged claims against Dahl. Johnson's motion for summary judgment is DENIED as to plaintiffs' tenth claim.

### VI.    CONCLUSION

In accordance with the foregoing, Johnson's motion for summary judgment is GRANTED in part and DENIED in part. It is granted as to plaintiffs' third claim and seventh claim, and granted in part as to plaintiffs' fourth claim and eighth claim. It is denied as to all remaining claims. Populous' motion is GRANTED in its entirety.

IT IS SO ORDERED.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-9273 CAS (RCx) | Date | November 15, 2011 |
|----------|----------------------|------|-------------------|
| Title | EXECUTIVE SECURITY MANAGEMENT, INC., ET AL. v. JACK DAHL, ET AL. | | |

|  | 00 | : | 00 |
|---|---|---|---|
| Initials of Preparer | RS | | |